MaddeN, Judge,
delivered the opinion of the court:
These plaintiffs, 91 in number, are or were administrative enrollees in the United States Maritime Service, assigned for duty to the United States Merchant Marine Academy at Kings Point, New York. Their pay was reduced in 1954, and they contend that the reduction was in violation of section 216(a) of the Merchant Marine Act of 1936, as amended, 53 Stat. 1182-1183, 46 U.S.C. § 1126(a), which provided, as to the United States Maritime Service:
The ranks, grades, and ratings for the personnel of said service shall be the same as are now or shall hereafter be prescribed for the personnel of the Coast Guard.
This court on March 5,1958, overruled the motions of both parties for summary judgment. 141 Ct. Cl. 569. That meant that the case should go to trial for a determination of the facts. It was conceded that the reevaluation of positions *509 which, resulted in the 1954 reductions in pay was not made on the basis of Coast Guard standards, but was made on the basis of the standards used for classifying civilian Government positions covered by the Classification Act of 1949, 63 Stat. 954, 958, 5 U.S.C. §§ 1071,1101 (b). In our opinion we said:
Unless the status assigned to the positions in the reevaluation happened to coincide with that of comparable positions in the Coast Guard, we think the reevaluation was illegal and that persons who were prejudiced by it may recover. 141 Ct. Cl. at 573.
We refer to our earlier decision for the background and history of the case.
When the Academy was established in 1942 the personnel was assigned ranks, grades or ratings, presumably on the basis of the qualifications of the enrollees and of the needs of the Academy. When the reevaluation of positions occurred in 1953, the positions of 44 enrollees were upgraded, those of 101 were left unchanged, and those of 128, including the 91 plaintiffs, were downgraded. The positions were graded, as we have seen, by the standards of the civilian civil service, and then Avere given the maritime rating such as, for example, Chief Petty Officer, Petty Officer 3d Class, or Seaman, the pay of which would correspond to the pay of a classified civil sendee employee holding a comparable position.
The only witness on the subject of how enrollees doing tasks in the Coast Guard comparable to those done in the Merchant Marine Academy by the plaintiffs would be rated was Commander Pfeiffer of the Coast Guard. His qualifications and his testimony are described in finding 18. The situations in the two services are in many respects not comparable. In the Coast Guard the table of organization authorized by statute allows so many officers and men of each rank. These officers and men are then assigned to do whatever needs to be done to operate the Coast Guard Academy. If a teacher of French is needed, and a Captain is competent and is not otherwise engaged, he might be assigned to that job. But in other circumstances an Ensign, if competent, *510 might be assigned. The assigned officer wonld get the pay of his rank, which would not be affected by the job to which he was assigned.
If we assume that there is no particular grade or pay attached to any job in the Coast Guard Academy, we would have to concede that the mandate of Congress that “the ranks, grades, and ratings * * * shall be the same as * * * for the personnel of the Coast Guard” is impossible of administration, unless it be construed as a command to the Maritime Administration to set up a table of organization comparable to that of the Coast Guard Academy, and then pay the men according to their rank regardless of what job they are assigned to. Congress did not mean that, because in the same section 216(a) which contains the language on which the plaintiffs rely, is the following statement:
The Commission[1] is authorized to determine the number of persons to be enrolled in the said service, to fix the rates of pay of such persons, and to prescribe such courses and periods of training as, in its discretion, is [sic] necessary to maintain a trained and efficient merchant marine personnel.
Immediately after that sentence comes the sentence on which the plaintiffs rely.
Although Commander Pfeiffer’s testimony shows that there may be many occasions in the Coast Guard in which the rank and salary of the officer or man has little relation to the work which, at least for the time being, he is doing, we have no doubt that, on the whole, there is in the Coast Guard as in all other rationally operated organizations, a correlation between rank and salary, on the one hand, and duties, on the other. Commander Pfeiffer’s testimony confirms this, since he was able, with regard to many of the plaintiffs, to determine, from their self-prepared job descriptions, what grade or rank a Coast Guard person having those duties would normally hold. In such cases, if the grade given on the 1954 reevaluation was lower than the Coast Guard grade would have been, the plaintiff is entitled to recover the difference in pay between the two grades.
*511 As to nine of the plaintiffs, the kind of work which they did at the Merchant Marine Academy was not done by Coast Guard service personnel at the Coast Guard Academy, but was done by wage board employees at the rates of pay prevailing in the area. Presumably the reevaluation of these positions by civil service standards in 1954 set the wages by proper wage board standards. In any event, it is not possible to apply the Coast Guard standards prescribed by section 216 (a) to these nine plaintiffs.
In the cases in which Commander Pfeiffer stated that the proper Coast Guard rating would have been one or the other of two possible ratings, as, for example, in the case of the plaintiff Burke, where the rating might have been either PO-3 or PO-2, our decision will be based upon the lower of the two possible ratings, i.e., in the example given above, the PO-3.
As to those members of the teaching staff who, according to Commander Pfeiffer’s statement, would, if they had occupied similar positions in the Coast Guard, have been eligible for promotion, we suppose that they would have received these promotions if Coast Guard standards had been applied. The promotions will be regarded, in our decision, as having been made.
The Government urges that the plaintiffs did not exhaust their administrative remedies by appealing to the Civil Service Commission. The contention is not valid. The Government does not contend that any of the plaintiffs except those who were veterans had any right to appeal to the Civil Service Commission. The plaintiff Jarett, whose case was typical of those of the veterans, did appeal and his appeal was rejected by the Commission. The other veteran plaintiffs were aware of this fact. We think they were not required to go through obviously useless motions in order to preserve their rights.
The plaintiffs named in the paragraph of finding 19 which precedes the table are entitled to recover, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 38(c). The remaining plain *512 tiffs are not entitled to recover and the petition as to them will be dismissed.
It is so ordered.
Durfee, Judge; LaiiamoRe, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
FINDINGS 0E FACT
The court, having considered the evidence, the report of Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. On April 30, 1954, plaintiffs were administrative en-rollees in the Maritime Service. Plaintiffs Walsh, Dittrick, Flint, Giddings, Jarett, Maya and Stapleton were on this date commissioned officer instructors at the United States Merchant Marine Academy, Kings Point, New York, while the balance of the plaintiffs named in the petition were assigned to duty involving staff and administrative functions there. On the date above they were all reduced in rank and compensation by the Commandant, United States Maritime Service, as a result of a billet survey, which they allege was unlawfully carried out according to provisions and standards of the Classification Act of 1949 (63 Stat. 954, 958, 5 U.S.C. §§ 1071,1101(b)). They allege that defendant’s action was in violation of section 216(a) of the Merchant Marine Act of 1936, as amended (53 Stat. 1182-1183, 46 U.S.C. §1126(a)).
By stipulation at a pretrial conference the trial of this case was limited under Eule 38 (c) to the issue of liability.
2. The following table shows the ranks of plaintiffs before and after the reduction on April 30, 1954, together with other pertinent information about their status as indicated by the subheadings:

*513

*514

*515

*516 3. The United States Merchant Marine Academy at Kings Point, New York, was established in 1942 under wartime conditions and the ranks, grades and ratings of the staff evolved from this wartime organization. Investigations conducted by the Maritime Administration in 1953 revealed that, as a result of evolution of the wartime organization, there were serious discrepancies between the work performed and the ratings or ranks of the men performing such work. Accordingly, late in 1953, the Maritime Administration ordered an objective survey of all administrative enrollee positions at the Academy. The survey, which was begun in November 1953, was conducted by officials of the personnel office of the Maritime Administration, all of whom are fully competent and qualified in personnel matters. The Superintendent of the Academy and the then Chief, Office of Maritime Training, both acting under direction and authority of the Maritime Administrator, assisted and cooperated in the making of the survey.
4. The parties have agreed that the survey mentioned above was conducted in the manner hereafter described. All administrative enrollees, including the Superintendent and the then Dean, except a few unskilled laborers such as groundskeepers and kitchen helpers, prepared and submitted descriptions of their positions, setting forth, among other things, their duties, responsibilities and teaching assignments (in the case of instructional personnel). Wherever necessary or advisable, those personnel specialists who were conducting the survey held personal interviews with faculty members and other employees in regard to their duties, responsibilities and the requirements of their respective assignments. The position descriptions were checked, where necessary, with supervisory personnel and department heads at the Academy and with the Dean or Superintendent, so that discrepancies or questions of authority or responsibility could be resolved. Upon completion of these checks and rechecks of the position descriptions, trained personnel officials analyzed the descriptions, taking into consideration, with regard to instructional positions, such factors as courses taught, level of courses (whether elementary, intermediate, or advanced), participation in curriculum planning, lesson *517 planning, and requirements of specific positions. This same kind of thorough analysis, based on sound and accepted principles of position evaluation, was performed in regard to noninstructional positions. As a result of the survey, approximately 44 administrative enrollees were raised in grade, 128 were downgraded (91 of whom are plaintiffs here), and 101 remained in their former status as to rank, rating or rate of pay.
It is customary personnel practice, followed in the interest of good management, to evaluate and classify duties and responsibilities of all Federal civilian positions to assure equal grade and pay for substantially equal or comparable work. To this end, while Maritime Training Service administrative enrollee positions are not subject to the mandatory classification standards and compensation schedules of the Classification Act of 1949, the Maritime Administration, in its discretion, decided to utilize the classification standards issued by the Civil Service Commission pursuant to the Classification Act of 1949 as a reference and guide in the evaluation of administrative enrollee positions. This discretionary use of the civil service classification standards had the effect of bringing the personnel situation in the Maritime Training Service, a hitherto unremedied situation created by wartime expediency, into line with other civilian agencies and personnel practices, by providing ranks, ratings and rates of pay within the service which are commensurate with grades and pay for comparable work in other Federal civilian agencies.
5. When defendant made the survey, the positions held by plaintiffs were evaluated in terms of civil service grades and ratings. The Chief of Classification for the Maritime Administration, an experienced civil service classifier who handled the evaluation at the Academy in 1953 and recommended changes in the ranks and ratings, using civil service standards, was not familiar with Coast Guard descriptions or standards, nor had he previously evaluated any teaching positions. He did not know whether the plaintiffs had ranks and pay comparable to Coast Guard personnel before or after they were demoted as a result of the reevaluation of their billets. As a matter of fact, at this time, *518 April 80, 1954, the Coast Guard did not haye job or billet descriptions for officers and enlisted men assigned to its Academy. The manner in which Coast Guard billets are filled is described hereafter. This classifier was aware that the Merchant Marine Act had a provision that ranks, grades and ratings of personnel of the service should correspond to those of the Coast Guard but evaluated them by using civil service standards because he was directed to do so by his superior, the Chief Personnel Officer for the Maritime Administration.
6. The civil service standards used in evaluating plaintiffs’ billets comply with generally accepted principles of personnel classification analysis and administration since they recognize and give weight to the differences in the difficulty, responsibility, qualifications and knowledge required for the performance of the work of various positions. This evaluation was applied to job descriptions prepared by the employees holding the particular billets involved here. Defendant also considered the inherent complexities of the work, the supervision and guidance a person received, the amount and frequency of instruction required, and the authority to make decisions and command commitments. In evaluating each job, where more than one skill was required in the particular billet, the more demanding skill would be used to determine the grade. When the evaluation was completed, a conversion table was prepared to show what ranks and ratings in the United States Maritime Service should equate to grades and ratings under the classification system and the new ranks and ratings were assigned to plaintiffs.
7. All administrative enrollees were given advance notice of the proposed action, an opportunity to reply, and a notice of final decision. Those enrollees who as veterans were so entitled by section 14 of the Veterans’ Preference Act, were notified in writing by the Chief of the Maritime Training Service of their right to appeal, including the right of appeal to the Eegional Director, Second Civil Service Eegion. The Eegional Director, in turn, notified those who sought review by him of their right to appeal his decision to the United States Civil Service Commission. Some 27 enrollees *519 appealed their reductions in grade to the Second Civil Service Regional Office, which upheld the propriety of the down-gradings in all cases but two. In these two cases, the Regional Office ordered further downward adjustment after evaluation of the enrollees’ duties and responsibilities. At least three of the plaintiffs appealed the Regional Office decision to the Civil Service Commission. These appeals were denied. Plaintiffs’ claims to the General Accounting Office were rejected.
8. Plaintiffs Barton, Beginsky, Birnbaum, Brazeil, Bush, Dinneen, Duke, Feron, Foster, Giddings, Goldfarb, Iwanuk, Johnson, Lind, Rose, Stapleton, Whitty and Young, veterans by reason of their service in the Armed Forces, replied to the advance notice of the proposed action to reclassify their positions downward. Each of these plaintiffs appealed the reclassification action to the Director, Second Civil Service Region, but failed to appeal the Regional Director’s affirmance of the proposed reclassification action to the Civil Service Commission.
9. Plaintiffs Butler, Chojnowski, Crafts, Daniels, Dibble, Harris, Ivan, McAmerney, McCormack, Mitchell, Nieves, Perkins, Picone, Stokes, Tripner, Warren, Welch and Wright, veterans by reason of their service with the Armed Forces, did not reply to the advance notice of proposed downward reclassification of their positions and did not appeal the action either to the Regional Director or to the Civil Service Commission.
10. Plaintiff James P. Walsh, a nonveteran, was reduced in grade from lieutenant commander to lieutenant and no changes were made in his duties or those of any other members of the teaching staff who were reduced in rank. When he received notice of the proposed action, which was later taken, he submitted detailed objections thereto on April 1, 1954, to the Commandant, United States Maritime Service. They were rejected by the Commandant on April 16, 1954. On April 27, 1954, plaintiff Walsh wrote another letter to the Commandant, questioning the legality of the proposed action, and on May 12, 1954, the Commandant replied, outlining in detail an explanation of why it was felt that the *520 action was proper and suggesting that Walsh correct his impression that the administrative discretion was improperly and illegally employed.
On May 21, 1954, plaintiffs Walsh and Maya addressed a joint letter to the Regional Director, United States Civil Service Commission, New York, referring to the correspondence with the Commandant and the advice of the latter that since Walsh was not a veteran he had no appeal rights. They advised that they desired to exhaust all possible administrative remedies before appeal to the courts and asked for review by the full Commission. The Regional Director, on June 8, 1954, replied that it was the decision of the Civil Service Commission that positions held by enrollees of the United States Maritime Service are not subject to the Classification Act, that the Commission has no authority to investigate the propriety of classification actions taken, unless an affected incumbent of a position is a preference eligible, and that since they did not have veterans’ preference they had no right of appeal.
11. Walsh discussed the ruling of the Civil Service Regional Director with others. Plaintiff Jarett, a veteran, then did pursue an appeal under section 14 of the Veterans’ Preference Act as far as the Commission, but it was rejected. This was known to other plaintiffs. There were no changes in Jarett’s duties as a result of his demotion or subsequent restoration to rank.
Plaintiff Walsh entered a claim on July 26,1955, with the General Accounting Office and prepared mimeographed versions of his claim for use by other plaintiffs. These efforts were not successful. The evidence indicates that the claim to the General Accounting Office was Walsh’s last effort made for administrative relief. Defendant has stipulated that Walsh exhausted all administrative remedies available to him.
12. Plaintiff Walsh requested and was permitted to leave the Academy, effective August 19, 1957. Prior to that he met with plaintiffs from time to time to discuss common problems. When the problems first arose, permission was sought from the Superintendent to meet on the base after working hours. When this permission was not granted, the *521 enrollees met elsewhere. The group present varied in size from 40 to 90. Walsh had no formal authority to represent fellow enrollees but they acknowledged his leadership. He informed them of actions he was taking in his own behalf and of the results he had and of what he knew about the experiences of others in a similar situation. He eventually kept a master file on all plaintiffs containing copies of their correspondence with the Academy and the Maritime Administration. He described his operation as a sort of “central clearing agency.” Walsh from time to time advised the authorities at the Academy of the actions he was taking in these particulars. He has been the spokesman for plaintiffs with their attorneys. During efforts for administrative relief from Maritime and the Civil Service Commission, Walsh permitted his name to be used to get information, and sought to keep the names of his associates, some now plaintiffs and others not, from the Academy authorities because of fear of reprisals upon them. Walsh told plaintiffs that he had been “called on the carpet” and instructed not to carry on correspondence about the operations of the Academy with third parties. He identified no correspondence he had in their behalf and in which their names were used. Plaintiffs admit that they did not all press their administrative remedies individually with these agencies. However, they filed claims which were disallowed by the Comptroller General.
13. Plaintiffs, as administrative enrollees under section 216(a) of the Merchant Marine Act, were assigned ranks and rating and granted pay and leave assimilated to that of the United States Coast Guard, but for all other purposes they were treated as civilian employees of the Federal Government. Their hybrid status might be described as quasi-military or -civilian or as in a twilight zone. They all contributed 6 percent of their base and longevity pay to the civil service retirement system and earned retirement in the same manner as civil service employees, except that retirement computation was based on their base pay, plus longevity, without regard for their subsistence, quarters, and any other allowances they might have. They have the benefits of the Federal employees’ group life insurance, unemployment compensation, Government employees’ incentive *522 awards plan, and old age and survivor’s insurance under social security. Section 216(a) of tbe Merchant Marine Act describes this as a “voluntary” organization. The Merchant Marine Academy has no courts-martial or similar disciplinary procedure. Administrative enrollees do not enroll for any particular length of time, nor do they receive any bonus for reenlistment. They can quit the service by requesting to be disenrolled or given inactive duty.
There are approximately 730 men in residence at the Academy at Kings Point and 260 assigned to merchant vessels. The latter ordinarily are disenrolled or resign from the Maritime Service and are on the payroll of the steamship companies.
Plaintiffs, prior to their demotion, enjoyed the pay and all allowances equivalent to the Coast Guard. This gave some of them a much larger total compensation than they would have received under the Classification Act.
The catalogue of information of the Academy, which is in evidence, describes it as a fully accredited military school, its student body is called a regiment, and the students are called Cadet-Midshipmen, a term said to be “borrowed” from the Naval Academy. They stand regularly assigned watches once a month under the supervision of commissioned officers. Cadet-Midshipmen receive uniform allowances. Graduates are qualified to file for a license either as third assistant engineers or third mates upon satisfactory completion of the course of instruction at the Academy. Applications are made to the Coast Guard. Graduates are awarded Bachelor of Science degrees.
The catalogue of information states:
A very strong interrelationship exists between the Academy and the United States Navy. All Cadet-Midshipmen are sworn in as members of the Merchant Marine Reserve of the U.S. Naval Reserve when they are appointed and all must sign an agreement to serve in the Navy for two years after graduation if called for such duty. In addition, all 'Cadet-Midshipmen must qualify for a commission as Ensign in the Naval Reserve upon graduation and agree to retain the commission for at least eight years. To qualify for this commission, Cadet-Midshipmen, both Deck and Engineer, must pur *523 sue courses in Naval Science subjects and complete a prescribed Naval Beserve Officers Training program.
None of the plaintiffs here were Cadet-Midshipmen. They were either instructors or assigned to staff and administrative functions, as noted in finding 1.
14. Enrollments at the two academies are approximately the same. There are no foreign languages taught at the Coast Guard Academy as at the Merchant Marine Academy and the academic course at the latter covers three years while it is of four years’ duration at the Coast Guard Academy. Both schools, however, are accredited institutions of education on the college level.
The allowances for the staff at the Coast Guard Academy are set up in table form by the Chief of the Personnel Allowances Section, Program Analysis Division, Office of the Deputy Chief of Staff of the Coast Guard. He is guided by the requirements of Title 14, section 42 of the United States Code. Presently, because personnel allowances are established as a “general guide” for assignment of personnel, the ranks and ratings of incumbents in jobs at the Coast Guard Academy do not always correspond exactly with the table of allowances set out for that Academy. They are followed only to the extent that personnel having requisite qualifications are available and in keeping with the number of personnel “on board,” i.e., actually attached to the Academy, within the Coast Guard’s overall appropriations. Sometimes, therefore, 'although it is not common, the Coast Guard might even assign someone to a job who holds a rank higher or lower than that specified on the personnel allowance sheet. This variation was not regarded by the Chief of the Personnel Allowances Section as a violation of Coast Guard regulations.
15. The permanent teaching staff at the Coast Guard Academy hold commissioned ranks in the Coast Guard. In addition, some regular officers of the Coast Guard are rotated to assignments at the Academy, and on occasion reserve officers on extended active duty are used as teachers. Appointments and promotions of teachers at the Coast Guard Academy are governed by statute and Treasury regulations. *524 Allowances for the permanent teaching staff are determined pursuant to regulations issued under authority of statute. Overall officer personnel requirements are considered with respect to other commissioned officers, and the Coast Guard personnel manual is consulted with reference to allowances for the billets of enlisted personnel.
16. The evidence establishes a number of additional facts about the filling of Coast Guard billets. For instance, in authorizing petty officer billets, where four or five men of a particular rating are to be assigned to a unit, first-class, second-class and third-class petty officers would be assigned to the same unit in the Coast Guard even though the section chief and the third-class petty officers would all be performing the same duty. This is because there are more third-class petty officers than second-class, more second-class than first-class, and more first-class petty officers than chiefs.
All Coast Guard personnel are available for duty ashore and afloat except those who teach at the Academy and hold their positions under 14 XJ.S.C. § 186, et seq. These are instructors appointed subject to the competitive provisions of civil service laws and regulations and whose pay is fixed by the Classification Act. They are part of the permanent teaching staff assigned to the Academy. Of a total of 45 members of the teaching staff in 1954, eight were permanent. In normal circumstances, except where it involved promotion to the grade of captain, most members of the permanent teaching staff of the Coast Guard Academy have been promoted to the next higher grade as they became eligible thereof. Promotion of members of the teaching staff, however, is covered fully by regulations issued by the Secretary of the Treasury. Only three captains are allowed the Academy. Some of the teaching billets might call for much less rank than they carry, but the incumbent will have a higher rank because of longevity or time in grade. Personnel are not reduced in grade or rank to fit a job. They can be reduced for disciplinary reasons. If a man has too much rank for a given billet, he may be transferred or be given additional duties.
17. In 1954 the assignment of the teaching staff of 45 men at the Coast Guard Academy was as follows:

*525
Department of Engineering :

1 Captain
2 Commanders
4 Lieutenant Commanders, two of whom were members of the permanent teaching staff
3 Lieutenants
1Chief Machinist

Department of Humanities:

1 Commander (permanent member of the teaching staff)
2 Lieutenant Commanders (both permanent members)
2Lieutenants
2 Civilians

Department of Physical Education:

1 Commander (a member of the permanent teaching staff)
2 Civilians

Department of Science:

1 Commander (a member of the permanent teaching staff)
1 Lieutenant Commander (a member of the permanent teaching staff)
5 Lieutenants
1 Lieutenant, Junior Grade Department of Professional Studies:
2 Captains
2 Commanders
3 Lieutenant Commanders
3 Lieutenants

Department of Mathematics:

1 Commander (a member of the permanent teaching staff)
1 Lieutenant Commander (a member of the permanent teaching staff)
4 Lieutenants
The above ranks and numbers thereof are at variance with the personnel allowance table for the Coast Guard Academy in 1954.
18. At the trial of this case, defendant offered the evidence of Commander Victor Pfeiffer of the United States Coast Guard. He is a man of long experience in the Coast Guard, entering the same in 1935 when appointed a Cadet at the Academy. His present job is that of Chief of the Personnel Allowances Section in the Program Analysis Division, Office *526 of tlie Deputy Chief of Staff. He is charged with the responsibility of determining manpower requirements to meet the needs of the Coast Guard, within limitations set forth by law, policy, and appropriated funds. This has been touched on in findings above. He did not interview plaintiffs nor examine their personnel files, but studied the job descriptions prepared by plaintiffs. He also discussed the matter with Maritime’s Chief of Classification who handled the reevaluation with defendant’s trial counsel. He did this in preparation for trial to make a determination on whether similar duties were performed at the Coast Guard Academy and what billet would be authorized to carry out each particular job. He attempted to assign ranks, ratings, and pay grades to each job, based on 1954 Coast Guard standards and allowances. He found some billet descriptions at the Maritime Academy for which no comparable billet existed at the Coast Guard Academy in 1954. Some positions at the former were filled by military personnel, whereas the Coast Guard used Wage Board employees hired under civil service but paid according to prevailing wage rates in the locality. In this category are the billets of plaintiffs Daniels, Feron, Foley, Kasil, Kupcynskas, Paradisin, Schidlowski, Smaid-zun, and Trznadel.
Commander Pfeiffer admitted that, except as the job descriptions prepared by plaintiffs reflected their education and their military and other experience, he did not take these things into consideration. Further, he admitted that his analysis was based on civil service standards and could not be the basis for a determination of comparable status of positions between the Coast Guard and Merchant Marine Academies at a given time, since the task performed in the Coast Guard would not govern the rank assigned to the man performing the task. There is no evidence in the record as to whether the positions assigned to plaintiffs were the same or similar to positions in the Coast Guard prior to the reevaluation effective on April 30, 1954. When asked if the status assigned to the positions in the reevaluation happened to coincide with that of comparable positions in the Coast Guard, he replied that he had not seen or studied the actual position descriptions of the Maritime Administration and therefore *527 could not testify as to whether they are comparable to the examples he made independently. Defendant admits that, while in some instances the rank or pay grade assigned by Commander Pfeiffer to a given billet might correspond to similar Coast Guard positions, in other instances a higher rank would be indicated.
19. Within the limitations and qualifications found above, Commander Pfeiffer’s evaluation of plaintiffs’ job descriptions in accordance with United States Coast Guard rules,
regulations, and personnel policy and practices, as they existed in April 1954, results in the table of allowances set forth below which may be compared to those assigned to plaintiffs after the reevaluation as shown in finding 2. It will thus be noted that, with the qualifications shown below, the instructors (Walsh, Maya, Jarett, Flint, Giddings, Dit-trick and Stapleton) would have been entitled to higher ranks by Coast Guard standards. This would have been true, also, of plaintiffs Barton, Beginsky, Bland, Brennan, Butler, Duke, Ehrich, Foster, Hartmann, Kaplan, William Leong, Lovely, Odell, Oliver, Biddell, Bose, Upson, Van Wagenen, and Warren. It would also have been true of plaintiff Harris for the period commencing July 12, 1954. The evidence establishes that to the extent there is any similarity between plaintiffs’ positions after their reevaluation and comparable Coast Guard positions, it is by accident and not by design.
Billet authorised under Name of incumbent Coast Guard standards[1]
Alexander_ SN (Seaman).
Archer_J_ SK 2 (PO-2).
Barnash_ TN (same as Seaman).
Barton_ SPOK, W-l (W-l pay grade warrant officer).
Beginsky_ SD 3 (PO-3).
Beusse (who viced Norton SK 1 (PO-1). who held job during survey).
Birnbaum_ CS 1 (PO-1).
Bland_ PO 2 (although Seaman ior 80% oí duties).
Brazeil_ SK 2 (PO-2).
Brennan_ QM 1 or BM 1 (PO-1).
Bush_ Seaman or PO-3.
Burke (who viced Oola the QM 3 or QM 2 (PO-3 or PO-2). original incumbent).
Butler_ SD 2 (PO-2).
Calcano_ TN (same as Seaman).
*528 Name of incumbent Billet authorized under Coast Guard standards[1]
Carrington-_TN or SN (both same as Seaman).
Chojnowski_,-__SD 3 (PO-3).
Crafts (who viced Cunning, the original incumbent). QM 3 or QM 2 (PO-3 or PO-2)
Daniels-PO-2 (This position has no equivalent in the Coast Guard. It would be filled by Wage Board personnel under ordinary circumstances. However, if a military man were detailed to drive a bus, a PO-2 would be considered adequate. The clerical duties would not justify a billet above the PO-2 level.)
Dibble_ QM 3 or QM 2 (PO-3 or PO-2).
Dinneen_ SKI (PO-1).
Duke (who viced Walker or according to note). CS 2 or CS 3 (PO-2 or PO-3).
Ehrieh_ SD 2 (PO-2).
Eeron_ MM 1 (PO-1) (This position has no equivalent in the Coast Guard. It would be filled by Wage Board personnel under ordinary circumstances.)
Foley-PO-2 (This position has no equivalent in the Coast Guard. Normally Wage Board personnel would fill it.)
Foster_ SD-1 (PO-1).
Ganaway-SN (Seaman).
Garcia_ CS 1 (PO-1).
Goldfarb_ SD 3 (PO-3).
Hamilton_ SK 2 (PO-2).
Hartmann_ QM 1 or BM 1 (PO-1).
Heywood (who viced Pate, the incumbent). CS 1 (PO-1).
Hennes_ YN 2 (PO-2).
Hollis_ SN (Seaman).
Iwanuk_ SK 3 (PO-3).
Ivan_ QM 3 or QM 2 (PO-3 or PO-2).
SN (Seaman).
Johnson_ SN (Seaman).
Josué_ TN (same as Seaman).
Kaplan_ YN 2 (PO-2).
Kupcynskas_ PO-3. (There is no military equivalent for this position. Ordinarily calls for Wage Board employee. If it were to be filled by military, a Seaman or PO-3 would be adequate.)
Kasil-(There is no military equivalent for this position. There is no requirement in the Coast Guard that any military man prune trees or clip shrubbery. Under no circumstances would it be filled by a military man. Coast Guard, instead, would authorize a Wage Board employee to perform the work.)
*529 Billet authorized under Name of incumbent Coast Guard standards[1]
Leong, Dick_SD 3 (PO-3).
Leong, William_SD 2 (PO-2).
Lind_CS 2 (PO-2).
London_YN 1 (PO-1).
Lovely_CS 2 (PO-2).
McAnerney_QM 3 or QM 2 (PO-3 or PO-2).
McCormack_QM 3 or QM 2 (PO-3 or PO-2).
McKenzie_SN (Seaman).
Mack (who viced McIntosh, TN (same as Seaman), the original incumbent).
Maksymkow_CS 2 (PO-2).
Mitchell_SD 3 (PO-3).
Multer_BM 1 (PO-1).
Munda_BM 1 (PO-1).
Nieves_ CS 2 (PO-2).
Norton___SK 1 (PO-1).
Odell_QM 1 or BM 1 (PO-1).
Oliver_PO-2.
Palmato_SN (Seaman).
Paradisin_ (There is no military equivalent. Ordinarily would call for a Wage Board employee. Under no circumstances would it be filled by a military man.)
Perkins___SK 3 (PO-3).
Picone_ CS 2 (PO-2).
Riddell_CS 1 (PO-1).
Rose_SD 3 (PO-3).
Shidlowski_ (No military equivalent. Ordinarily would call for a Wage Board employee. Under no circumstances would it be filled by a military man.)
Shufford_SN or PO-2 (Seaman or PO-2).
Smaidzun_ (No military equivalent. Ordinarily would call for a Wage Board employee. Under no circumstances would it be filled by a military man.)
Smalls_TN (same as Seaman).
Stokes_TN (same as Seaman).
Trznadel_ (No military equivalent.)
Upson_PO-2 (although Seaman for 70% of duties).
Van Wagenen (who viced SDC (CPO). Wilson, the original incumbent).
Verbraeken_SD 3 (PO-3).
Verdino_SN (Seaman).
Warren_CS 3 (PO-3).
Washington_ CS 2 or CS 3 (PO-2 or PO-3).
Welch_TN (same as Seaman).
3
Wiggins (who viced Bucher, CS 2 (PO-2). the incumbent).
Winkler (who viced Arbone, the original incumbent). SK 1 (PO-1).
Wright (who viced Williams, the CS 2 or CS 3 (PO-2 or PO-3).
1 or C (PO-1 or CPO).

*530
Billet authorized under Name of incumbent Coast Guard standards 
[1]

Harris (who viced Hamilton, SK 2 (PO-2) the original incumbent. Harris held this position until July 12, 1954. See note immediately below).
Harris (who viced Fallon, the EN 1 (PO-1). original incumbent, effective July 12, 1954. This was done at Harris’ request.)
Tripner (who viced Rankin, SK 1 (PO-1). the original incumbent.)
TEACHING STAFF
Walsh_Lieutenant or Lieutenant Commander, if incumbent was a regular Coast Guard officer, assigned to the Academy merely for a tour of duty as an instructor. If the appointment was as a member of the permanent teaching staff under title 14 U.S.C. §§186— 189, the appointee would be eligible for promotion to Lieutenant Commander or Commander.
Maya_Lieutenant, if incumbent was a regular (or reserve) Coast Guard officer assigned to the Academy merely for a tour of duty as an instructor. If the appointment was as a member of the permanent teaching staff under title 14 U.S.C. §§186-189, the appointee would be eligible for promotion to Lieutenant Commander. This further assumes that the Masters Degree which the incumbent holds was in the Romance Languages. It should be further noted that no foreign languages are taught at the Coast Guard • ' Academy.
Jarett_Lieutenant Commander (either as a regular officer assigned to the Academy for a tour of duty or as a title 14 U.S.C. §§186-189 appointee.)
Flint_As a title 14 U.S.C. §186-189 appointee, incumbent would be eligible to promotion to Commander. Until incumbent actually became a department head (he is only the assistant head) he would not be eligible for promotion to Captain. Incumbent, if merely assigned for a tour of duty as an instructor, could be a Lieutenant Commander or Commander.
Giddings_■_Lieutenant Commander as a title 14 U.S.C. §§186-189 permanent member of teaching staff. Lieutenant, if a regular line officer were assigned for a tour of duty as an instructor.

*531
Billet authorized under Hume of incumbent Coast Guard standards 
[1]

Dittrick_As a title 14 U.S.C. §§186-189 permanent member of the teaching staff, incumbent would be eligible for promotion to Commander. If a regular officer were assigned to the job for a tour of duty, a Lieutenant Commander would be authorized.
Stapleton_Since incumbent does not hold a Masters Degree he would not qualify as a member of the permanent teaching staff. As a line officer assigned for a tour of duty at the Academy, a Lieutenant, Junior Grade, or Lieutenant would be authorized.
CONCLUSION OE LAW
Upon tbe foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs James P. Walsh (1), Mariano M. Maya (56),* Lawrence Jarett (41), Winston A. Flint (26), Thomas H. Griddings (31), John M. Dittrick (22), Timothy B. Stapleton (76), James E. Barton (5), Charles Beginsky (6), Alvin Bland (9), Christopher E. Brennan (11), Carl E. Butler (14), Victor E. Duke (23), Fred E. Ehrich (24), Carlington E. Foster (28), Jos. J. Hartmann (35), Daniel Kaplan (45), William Leong (49), Frank E. Lovely (52), Harry H. Odell (64), Francis E. Oliver (65), William Bid-dell (70), Eobert M. Eose (71), James B. Upson (80), Bichard C. VanWagenen (81), Willie H. Warren (84),* and Walter F. Harris (34), are entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38(c).
It is further concluded that the remaining plaintiffs are not entitled to recover and the petition as to them is dismissed.
*532 In accordance with the opinion of the court and on the memorandum reports of the commissioner as to the amounts due thereunder, it was ordered on March 31,1961, that judgments be entered for the remaining 25 plaintiffs. It was further ordered on January 5, 1962, and February 23, 1962, that the judgments entered March 31, 1961, be amended on the uncontested motion of plaintiffs to reflect appropriate credits to their retirement and life insurance accounts.

 Now the Maritime Administration in the Department of Commerce.

 Maritime terminology in parentheses.

 Maritime terminology In parentheses.

 Maritime terminology In parentheses.

 Maritime terminology in parentheses.

* Pursuant to a memorandum report of the commissioner on March 29, 1961, recommending that plaintiffs Mariano M. Maya (58) and Willie H. Warren (84) are not entitled to recover and making findings of fact in support of such recommendation, it was ordered on March 31, 1961, that these findings be adopted by the court, modifying its findings, opinion and judgments, and that the petition as to plaintiffs Mariano M. Maya (58) and Willie H. Warren (84) be dismissed.