# United States Court of Appeals for the Federal Circuit

2006-1652

CORUS STAAL BV,

> Plaintiff-Appellant,

v.

UNITED STATES,

> Defendant-Appellee,

and

UNITED STATES STEEL CORPORATION ,

> Defendant-Appellee.

Richard O. Cunningham  and  Alice A. Kipel, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiff-appellant.  With them on the brief were Joel D. Kaufman, and Jamie B. Beaber.

Claudia Burke, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee, United States.   With her on the brief were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.

Jeffrey D. Gerrish, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, argued for defendant-appellee, United States Steel Corporation.  With him on the brief were John J. Mangan and Robert E. Lighthizer.

Appealed from:  United States Court of International Trade

Chief Judge Jane A. Restani

# United States Court of Appeals for the Federal Circuit

2006-1652

CORUS STAAL BV,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

UNITED STATES STEEL CORPORATION,

Defendant-Appellee.

_____

DECIDED:  September 21, 2007

_____

Before RADER, BRYSON, and MOORE, <u>Circuit Judges</u>.

BRYSON, <u>Circuit Judge</u>.

This case concerns the Department of Commerce's second administrative review of an antidumping order covering hot-rolled steel from the Netherlands.  The importer, Corus Staal BV, appealed Commerce's final determination to the Court of International Trade, challenging Commerce's use of the so-called zeroing methodology to calculate Corus's dumping margin, Commerce's unfavorable classification of certain of Corus's sales transactions, and Commerce's determination that Corus had absorbed antidumping duties rather than passing them on to its customers.  The Court of

International Trade upheld Commerce's use of zeroing and its classification of the disputed sales transactions. With regard to the absorption issue, the court held that Corus had failed to exhaust its administrative remedies and therefore had not preserved that issue for judicial review. We affirm.

I

"Zeroing" is a method of calculating weighted average dumping margins. It works as follows: Commerce first determines a dumping margin for U.S. sales of a particular product by comparing the transaction price with the monthly weighted average "normal value" of that product, i.e., the price charged for the product in its home market. See 19 U.S.C. § 1677b. Commerce then aggregates the dumping margins for all U.S. sales made below normal value. With respect to all U.S. sales made above normal value (i.e., non-dumped sales), Commerce assigns a dumping margin of zero. Thus, when Commerce calculates the weighted average dumping margin, the dumping margins for sales below normal value are not offset by "negative dumping margins" for those sales made above normal value.

In the second administrative review, which is at issue in this case, Commerce employed the zeroing methodology to calculate the weighted average dumping margins for Corus's hot-rolled steel products. This court has held that although the antidumping statutes do not require the use of zeroing in calculating dumping margins, Commerce's zeroing methodology is a permissible interpretation of the statutory provisions. See Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1347 (Fed. Cir. 2005); Timken Co. v. United States, 354 F.3d 1334, 1340-45 (Fed. Cir. 2004).

Corus does not directly challenge our decisions upholding Commerce's use of zeroing. Rather, Corus notes that Commerce issued its final determination for the second administrative review in April 2005, and it argues that subsequent events show that Commerce has adopted a new policy with regard to zeroing and that the new policy should be applied to the second administrative review.

The new developments to which Corus refers are the following: In 2003 the European Communities ("EC") initiated a complaint before the World Trade Organization ("WTO") challenging the United States' use of zeroing in certain antidumping investigations and administrative reviews. A WTO panel initially found that the use of zeroing in antidumping investigations was inconsistent with the United States' obligations under the WTO Anti-Dumping Agreement, but it upheld the use of zeroing in administrative reviews, both "as such" and "as applied." See Panel Report, United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing"), ¶ 8.1(a), (c)-(g), WT/DS294/R, (Oct. 31, 2005). The WTO Appellate Body subsequently reversed the portion of the panel's decision that upheld the use of zeroing "as applied" to the administrative reviews challenged by the EC. See Appellate Body Report, United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing"), ¶¶ 135, 263(a)(i), WT/DS294/AB/R (Apr. 18, 2006). The panel report, as modified by the Appellate Body report, was then adopted by the WTO Dispute Settlement Body. United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing"), WT/DS294/17 (May 15, 2006).

Following the WTO panel decision, Commerce announced that it would abandon the use of zeroing in conjunction with average-to-average comparisons to calculate

weighted average dumping margins in antidumping investigations,[1] and it sought comments on alternative approaches to be used in future investigations. Antidumping Proceedings: Calculation of the Weighted Average Dumping Margin During an Antidumping Duty Investigation, 71 Fed. Reg. 11189 (Mar. 6, 2006). After the panel report was adopted by the Dispute Settlement Body, the United States stated that it would implement the Dispute Settlement Body's recommendations and rulings. See Agreement under Article 21.3(b) of the DSU, United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing"), WT/DS294/19 (Aug. 1, 2006); see also Press Release, United States Mission to the United Nations in Geneva, U.S. Statements at the WTO Dispute Settlement Body Meeting (May 30, 2006). Those statements, Corus argues, demonstrate that Commerce has abandoned the policy of zeroing. Corus notes that Commerce has since recalculated Corus's dumping margin (without zeroing) and, based on a finding of no dumping under that methodology, has revoked its antidumping order effective April 23, 2007. Implementation of the Findings of the WTO Panel in US – Zeroing (EC): Notice of Determinations Under Section 129 of the Uruguay Round Agreements Act and Revocations and Partial Revocations of Certain Antidumping Duty Orders, 72 Fed. Reg. 25261, 25262 (May 4, 2007). Corus now asks us to remand this case so that Commerce can reconsider the final results of

---

[1] Average-to-average valuation refers to a comparison of the weighted average of the normal values to the weighted average of the U.S. prices for comparable merchandise. 19 U.S.C. § 1677f-1(d)(1)(A). In an antidumping investigation, when U.S. prices differ significantly among purchasers, regions, or periods of time, Commerce does not use average-to-average valuation, but compares the weighted average of the normal values to the U.S. prices for individual transactions. Id. § 1677f-1(d)(1)(B).

the second administrative review of the antidumping order in light of these recent developments.

We conclude that the events to which Corus points do not require a different result in this case and that Commerce has made amply clear that its new policy regarding zeroing would not apply to the administrative review at issue here. Subsequent to Corus's filing of this appeal, Commerce issued its final results in the fourth administrative review of the antidumping order. That ruling is particularly instructive, as there do not appear to be any relevant differences between that administrative review and the administrative review at issue in this case. In that decision, Commerce addressed the same issues that Corus now asserts need to be decided by Commerce in the first instance. Commerce's decision in that review makes clear that its policy has not changed with respect to the retrospective application of the zeroing methodology and that a remand to Commerce in this case would therefore serve no useful purpose.

It is clear that Commerce intends to apply its new policy on zeroing only prospectively. Section 129 of the Uruguay Round Agreements Act ("URAA") states that the implementation of adverse WTO decisions applies to unliquidated entries that enter or are withdrawn from the warehouse on or after the date that the U.S. Trade Representative directs implementation. 19 U.S.C. § 3538(c)(1)(B); see also Statement of Administrative Action for the URAA, H.R. Doc. No. 103-316, Vol. I at 1026 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4313. Accordingly, Commerce stated in the fourth administrative review that it "is not altering its administrative review determination as a result of the post-POR prospective revocation of the order." Issues and Decision

Memorandum for the 2004-2005 Administrative Review of Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands; Final Results of Antidumping Duty Administrative Review, 72 ITADOC 28676 (May 15, 2007).

When Commerce announced the elimination of zeroing in conjunction with the use of average-to-average comparisons to calculate dumping margins in antidumping investigations, it stated that the new policy did not apply to any other type of proceeding, including administrative reviews. Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification, 71 Fed. Reg. 77722, 77722-24 (Dec. 27, 2006). Thus, Commerce's new policy has no bearing on the present appeal, just as it had no effect on the final determination of Corus's fourth administrative review.

Corus notes that the WTO Appellate Body recently found that the use of zeroing in administrative reviews is inconsistent with the United States' obligations under the Antidumping Agreement. See Appellate Body Report, United States – Measures Relating to Zeroing and Sunset Reviews, WT/DS322/AB/R (Jan. 9, 2007). Corus claims that the United States has committed to comply with that ruling based on statements it made to the Dispute Settlement Body. See Press Release, U.S. Mission to the United Nations in Geneva, U.S. Statement at the WTO Dispute Settlement Body Meeting (Feb. 20, 2007). The United States, however, expressed strong reservations concerning any such implementation, noting that it "considers that the Appellate Body's findings relating to zeroing outside the context of average-to-average comparisons in investigations are devoid of legal merit," that the "findings suggest forms of implementation that simply make no sense from a policy perspective," and that "[i]t is difficult to conclude that

Members agreed upon such an illogical outcome." Id. Furthermore, the United States commented that although it "intends to comply in this dispute with its WTO obligations," it "will be considering carefully how to do so." Id. Those statements do not amount to the unequivocal adoption of the WTO decision suggested by Corus.

During the fourth administrative review, Commerce considered the effect of the most recent WTO decision. Corus argued that, in light of that decision, Commerce's interpretation of the statute as allowing continued use of zeroing was inconsistent with the United States' international obligations and therefore unreasonable. Commerce found otherwise, stating that "[b]ecause no change has yet been made with respect to the issue of 'zeroing' in administrative reviews, the Department will continue with its current approach to calculating and assessing antidumping duties in this administrative review." May 15 Issues and Decisions Memorandum.

As we observed in a previous case in which Corus challenged Commerce's zeroing methodology, we accord Commerce substantial deference in its administration of the antidumping statute. We explained that we "will not attempt to perform duties that fall within the exclusive province of the political branches, and we therefore refuse to overturn Commerce's zeroing practice based on any ruling by the WTO or other international body unless and until such ruling has been adopted pursuant to the specified statutory scheme." Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1349 (Fed. Cir. 2005). To the extent that recent developments have changed the current scheme, Commerce has made it clear that those changes do not apply retroactively to administrative reviews. Thus, our previous determination that

Commerce's policy of zeroing is permissible under the statute applies to the challenged administrative review.[2]

II

Corus next appeals Commerce's classification of certain of its sales to an unaffiliated U.S. customer as constructed export price ("CEP") transactions rather than export price ("EP") transactions. Commerce calculates dumping margins by comparing the normal value of subject merchandise to its price in the United States. As noted, the normal value is the price at which the subject merchandise "is first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B). The U.S. price is calculated using either the EP or CEP methodology. Those terms are defined in 19 U.S.C. § 1677a(a) and (b) in relevant part as follows:

> "[E]xport price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States . . . .
> "[C]onstructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter . . . .

---

[2] Corus also argues that, in light of the revocation of the antidumping order, Commerce's liquidation instructions in the subject review are no longer valid. The revocation of an antidumping order, however, does not automatically invalidate antidumping duties previously assessed for periods during which the order was in effect. See 19 U.S.C. § 1675(d)(3) (a determination to revoke an order shall apply to unliquidated entries entered "on or after the dates determined by the administering authority"); see also Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States, 464 F. Supp. 2d 1350, 1355 n.8 (Ct. Int'l Trade 2006) ("Commerce's exclusive authority includes establishing the effective date of revocation."); Okaya (USA), Inc. v. United States, 27 Ct. Int'l Trade 1509, 1511 (2003) ("If Commerce finds changed circumstances sufficient to justify revocation, the effective date of revocation is within Commerce's discretion.").

Due to certain adjustments made in calculating CEP, see 19 U.S.C. § 1677a(d), the use of CEP is more likely to result in a determination of dumping, or in a higher dumping margin. See AK Steel Corp. v. United States, 226 F.3d 1361, 1367 (Fed. Cir. 2000) (noting that these deductions are meant "to prevent foreign producers from competing unfairly in the United States market by inflating the U.S. price with amounts spent by the U.S. affiliate on marketing and selling the products in the United States").

Corus classified its sales as EP transactions on the theory that the first sale (or agreement to sell) to an unaffiliated U.S. customer occurred before the date of importation. Commerce found that the first sale occurred after the date of importation, and it therefore reclassified the sales as CEP transactions.

Corus's sales process for the goods in question operated as follows: First, Corus issued frame agreements that set forth a general framework outlining the estimated volume and pricing of the unaffiliated customer's likely purchases. Second, when Corus shipped merchandise to the United States, it issued pro forma invoices listing the shipped items for customs purposes. The goods were then stored at a warehouse in the United States until the customer placed a purchase order, at which point Corus performed a price calculation based on the quantity ordered and then-current market conditions. Once a price was finalized and agreed upon, Corus issued a sales invoice setting forth the terms of sale including product, quantity, and price. It then directed the goods to be shipped to the customer. Upon receipt, the customer remitted payment to Corus's U.S. affiliate or, later, to Corus directly.

Commerce found that the final sales invoices setting forth the terms of sale represented the first sale (or agreement to sell). Corus concedes that there was no sale

between Corus and its U.S. customers until a final invoice was issued, but it argues that either the frame agreements or the pro forma invoices should have been deemed to represent the first agreement to sell and thus those sales should have been characterized as EP sales.

That argument is without merit. In essence, Corus is arguing that the term "agreement to sell" covers what might best be termed a non-binding preliminary understanding between parties. Corus effectively acknowledged as much in the trial court. See Corus's May 13, 2004, Supplemental Response ("[Under the frame agreements,] there is no binding final agreement as to price, quantity or even specific products to be shipped. Rather, they provide an operating framework under which the customer and Corus can plan their business operations."); see also Corus's April 1, 2004, Supplemental Response ("Until the time of invoicing/shipment, Corus and/or the customer can change the quantity, price and/or specific product to be shipped."). Neither a sale nor an agreement to sell occurs until there is mutual assent to the material terms (price and quantity). With respect to the transactions at issue in this case, the mutual assent to price and quantity always occurred after the merchandise had been imported into the United States. Under 19 U.S.C. § 1677a, those transactions thus may not be classified as EP sales.

Corus argues that Commerce's approach impermissibly assigns the same meaning to both "sale" and "agreement to sell," and therefore violates the canon of statutory construction that different terms used in the same statute presumptively have different meanings. Corus's contention is unpersuasive. An "agreement to sell" is a binding commitment that has not yet been consummated by the exchange of goods for

consideration, i.e., the "sale" itself.  See AK Steel, 226 F.3d at 1370-71; NSK Ltd. v. United States, 115 F.3d 965, 975 (Fed. Cir. 1997) (sale "requires both a transfer of ownership to an unrelated party and consideration").  As used in the statute, the terms "sale" and "agreement to sell" thus cover different types of transactions, and Commerce's approach does not result in according the two terms the same meaning.

Corus argues that AK Steel dictates that its sales be treated as EP transactions. In AK Steel, we held that when the first sale to an unaffiliated customer is made by an exporter's U.S. affiliate, that sale is treated as a CEP transaction.  226 F.3d at 1371-72. Contrary to Corus's claim, however, AK Steel does not stand for the proposition that all sales by foreign sellers to unaffiliated U.S. customers should be considered EP transactions.  In fact, AK Steel states that transactions of the type at issue here, in which the sale made by a foreign producer or exporter occurs in the United States, should be treated as CEP transactions.  226 F.3d at 1367 n.6; see also id. at 1369 ("[T]he location of the sale appears to be critical to the distinction between the two categories.").  The statute, moreover, is clear on that point:  EP treatment is limited to transactions that occur between a seller outside the United States and a buyer inside the United States, before the date of importation.  19 U.S.C. § 1677a(a).

Corus argues that in its original investigation Commerce concluded that the frame agreements constituted the first sale (or agreement to sell).  See Notice of Preliminary Determination of Sales at Less Than Fair Value; Certain Hot-Rolled Carbon Steel Flat Products From the Netherlands, 66 Fed. Reg. 22146, 22148-49 (May 3, 2001).  That characterization, however, is not accurate.  Commerce did not find that the

frame agreements constituted the first sale or agreement to sell, but rather that the "final written confirmation" of price and quantity constituted the first sale or agreement to sell:

> Having reviewed the evidence on the record of this investigation regarding respondent's reported EP sales, we conclude that sales between the foreign producer (i.e., Corus Staal) and the U.S. customer were made "in the United States" by CSUSA [Corus's U.S. affiliate] on behalf of Corus Staal within the meaning of section 772(b) of the Tariff Act [i.e., 19 U.S.C. § 1677a(b)], and therefore, should be treated as CEP transactions. Specifically, although Corus Staal initially reaches the agreement with the U.S. customer on the estimated overall volume and pricing of merchandise, CSUSA provides the final written confirmation of the agreement, setting forth the agreed prices and quantities, to the U.S. customer.

Id. Corus notes that, following that determination, it eliminated the use of a U.S. affiliate as a sales intermediary in an effort to avoid CEP treatment of its sales, and it contends that under the rationale of Commerce's decision its transactions should be treated as EP sales. Yet a plain reading of Commerce's determination indicates that it was the fact that the sales, which were evinced by "agreed prices and quantities," occurred in the United States, not the fact that the sales were made by an affiliated company, that required the sales to be accorded CEP treatment.[3]

---

[3] Corus argues that Commerce classified its sales differently during the first administrative review and has now altered its position without justification. In the first administrative review, Commerce classified certain sales made to unaffiliated U.S. customers as EP transactions "because the contracts governing these sales were signed by Corus Staal in the Netherlands and Corus Staal served as the importer of record." 68 Fed. Reg. 68341, 68344 (Dec. 8, 2003). In that review, Commerce did not focus on whether the material terms in those contracts became binding only after the date of importation for the subject goods, and thus we do not find Commerce's treatment of those sales as EP transactions to be inconsistent with Commerce's treatment of Corus's sales in the present administrative review.

Corus also challenges Commerce's finding that Corus absorbed the antidumping duties on its U.S. sales rather than passing them on to its customers. On the merits, Corus contends that Commerce was not authorized to address the duty absorption issue because the duty absorption statute, 19 U.S.C. § 1675(a)(4), applies only when an affiliate of the foreign exporter is the importer of record, and not—as in this case—when the foreign exporter itself is the importer of record. Corus also argues that the methodology Commerce uses in duty absorption inquiries makes it effectively impossible for an importer that is found to be dumping to avoid a duty absorption finding. Finally, Corus argues that there is no evidence of record to support a finding that Corus absorbed antidumping duties and that, to the contrary, the evidence bearing on the duty absorption issue established that Corus had negotiated terms and prices with its U.S. customers designed to pass antidumping duties on to its customers.

The Court of International Trade held that Corus was precluded from challenging Commerce's duty absorption determination because Corus had failed to exhaust its administrative remedies with respect to that issue. Commerce first announced the absorption determination in its preliminary results for the administrative review. Certain Hot-Rolled Carbon Steel Flat Products From the Netherlands; Preliminary Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 70226, 70228 (Dec. 3, 2004). Corus did not challenge that finding in its subsequent case brief, even though that is the prescribed administrative remedy for challenging aspects of the preliminary results with which a party disagrees. By regulation, Commerce requires that "all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or

final results" must be raised in the party's case brief. 19 C.F.R § 351.309(c)(2). That requirement applies, the regulation states, even as to "any arguments presented before the date of publication of the preliminary determination or preliminary results." Id.

Corus acknowledges that it failed to raise any issue relating to the duty absorption issue in the case brief it filed following Commerce's issuance of the preliminary results in December 2004. Corus asserts, however, that it should be excused for not complying with the regulatory exhaustion requirement because addressing the duty absorption issue in its case brief would have been futile. Corus thus invokes the "futility exception" to the requirement that it exhaust its administrative remedies. See Asociacion Colombiana de Exportadores de Flores v. United States, 916 F.2d 1571, 1575 (Fed. Cir. 1990).

In support of its "futility" argument, Corus claims that it put Commerce on notice as to its position with regard to the absorption issue in its March 5, 2004, submission in response to Commerce's request for information, and Commerce responded by rejecting those arguments in the preliminary results in this case. In addition, Corus argues that in the past Commerce had consistently taken a position contrary to Corus's legal arguments regarding duty absorption and was therefore unlikely to accept those arguments if Corus pressed them in its case brief.[4]

---

[4] In its reply brief, Corus seeks to expand its argument, also invoking what it refers to as the "pure legal question" exception to the exhaustion requirement. Corus did not raise that argument in its opening brief, however, and we therefore treat that argument as waived. See United States v. Ford Motor Co., 463 F.3d 1267, 1277 (Fed. Cir. 2006); Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1375 n.4 (Fed. Cir. 2005); Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002). Moreover, Corus did not raise that argument before the Court of International Trade, where it relied solely on the "futility exception" and the fact that it challenged the duty absorption

The futility exception to the exhaustion requirement has been applied in situations in which enforcing the exhaustion requirement would mean that parties "would be 'required to go through obviously useless motions in order to preserve their rights.'" Bendure v. United States, 554 F.2d 427, 431 (Ct. Cl. 1977) (quoting Walsh v. United States, 151 Ct. Cl. 507, 511 (1960)). That exception, however, is a narrow one. The mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies. See Commc'ns Workers of Am. v. Am. Tel. & Tel. Co., 40 F.3d 426, 432-33 (D.C. Cir. 1994). Moreover, as the trial judge pointed out, the Court of International Trade generally takes a "strict view" of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases. See Ta Chen Stainless Steel Pipe, Ltd. v. United States, 342 F. Supp. 2d 1191, 1205 (Ct. Int'l Trade 2004); Pohang Iron & Steel Co. v. United States, 23 Ct. Int'l Trade 778, 792 (1999).

That is so for several reasons. First, Congress has directed the Court of International Trade, "where appropriate, [to] require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). Although that statutory injunction is not absolute, it indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies.

inquiry in response to Commerce's request for information. Corus has thus waived the "pure legal argument" claim on that basis as well. See Israel Bio-Eng'g Project v. Amgen, Inc., 475 F.3d 1256, 1265 (Fed. Cir. 2007) (issue not raised in trial court is waived on appeal); Cemex, S.A. v. United States, 133 F.3d 897, 902 (Fed. Cir. 1998) ("Ordinarily, when a party fails to make an argument in proceedings below, the argument is waived, and we will not hear it on appeal."); Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("With a few notable exceptions, such as some jurisdictional matters, appellate courts do not consider a party's new theories, lodged first on appeal.").

Second, as noted, Commerce's regulations specifically address the exhaustion requirement, as applied to challenges to antidumping determinations, and require a challenger to submit a case brief to Commerce that contains all the arguments that the submitter deems relevant, "including any arguments presented before the date of publication of the preliminary determination or preliminary results."  19 C.F.R § 351.309(c)(2).  The exhaustion requirement in this context is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review.

In addition to noting the statutory and regulatory provisions requiring exhaustion of administrative remedies, the trial court relied on the general policies underlying the exhaustion requirement—"protecting administrative agency authority and promoting judicial efficiency."  McCarthy v. Madigan, 503 U.S. 140, 145 (1992).  In McCarthy, the Supreme Court elaborated on those policies, explaining that the exhaustion doctrine is "grounded in deference to Congress's delegation of authority to coordinate branches, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer," and that the exhaustion requirement applies with special force when the agency proceedings in question "allow the agency to apply its special expertise."  503 U.S. at 145.  In addition, the Supreme Court noted, the exhaustion doctrine "acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."  Id.

Applying those principles to this case, the trial court explained that because of Corus's failure to raise its objections to the treatment of the duty absorption issue in the

preliminary results, Commerce could not revisit the duty absorption issue in the final results. Corus's failure to raise its duty absorption claims in its case brief, the court added, "essentially precluded Commerce from the opportunity to make a final determination on the issue."

Corus seeks to downplay the importance, in this case at least, of giving Commerce an opportunity to rule on challenges to the preliminary results before those challenges are raised in court. Corus contends that it satisfied all the policy concerns underlying the exhaustion requirement because it raised its objections to Commerce's duty absorption methodology in its March 4, 2005, submission and that Commerce had already made clear it was not willing to consider Corus's factual and legal arguments.

While it is true that Commerce had previously employed an approach to duty absorption different from the approach advocated by Corus, it is not obvious that the presentation of its arguments to the agency would have been pointless. Commerce's legal position with respect to the duty absorption issue is not dictated by statute or regulation, but is the product of policy decisions worked out by Commerce and applied in other cases. As such, Commerce is not bound to adhere to the approach it employs if a sufficiently persuasive showing is made that the approach is flawed in general or in its application to particular cases. See McCarthy, 503 U.S. at 147-48 (administrative remedy may be inadequate if agency lacks authority to grant relief). Moreover, Corus's argument has both legal and factual components. Even if it was unlikely that Commerce would adopt Corus's legal arguments as to the standards that should govern a duty absorption inquiry, it was still possible that upon full airing, Commerce might have accepted Corus's factual showing that it had not absorbed antidumping duties,

thereby obviating the need for judicial review. And even if it is likely that Commerce would have rejected Corus's legal and factual showings, it would still have been preferable, for purposes of administrative regularity and judicial efficiency, for Corus to make its arguments in its case brief and for Commerce to give its full and final administrative response in the final results. The response that Commerce gave in the preliminary results to the argument that Corus made in its March 5, 2004, submission was brief and was expressly designated as preliminary; it was not designed to be Commerce's last word on the matter. Thus, requiring Corus to set forth its factual and legal arguments in detail in its case brief would have had potential value either by resulting in possible relief for Corus or at least providing the agency an opportunity to set forth its position in a manner that would facilitate judicial review. Finally, contrary to Corus's claim, Corus did not raise in its March 4, 2005, document all of the arguments it pressed upon the trial court and continues to press here: in particular, it did not argue, as it now seeks to do, that Commerce lacked the authority to conduct a duty absorption inquiry because Corus was selling merchandise directly, not through "an importer who is affiliated with" Corus, see 19 U.S.C. § 1675(a)(4). Corus's comments in response to the request for information thus did not serve as an adequate proxy for the required presentation in its case brief.

On the other side of the scale, Corus has provided nothing by way of affirmative justification for its failure to raise the duty absorption issue in its case brief. This is not a case, for example, in which the private party was denied access to critical information prior to the time its case brief was due, or in which the agency changed its position or an important court decision was issued after the party's case brief would have been

filed. See Ta Chen, 342 F. Supp. 2d at 1206 n.18. Nor has Corus suggested that applying the exhaustion requirement was burdensome in that it occasioned "undue prejudice to subsequent assertion of a court action." McCarthy, 503 U.S. at 146-47. Corus's position is not that there was some justification for failing to follow the prescribed procedure; it merely contends that it was not required to do so because its submission was not likely to be accepted.

Where the issue of exhaustion of administrative remedies is not governed by a particular statutory provision or an overall statutory scheme, the decision whether to require exhaustion in a particular case is a matter committed to the discretion of the trial court; in particular, we have held that applying exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade. See Norsk Hydro Can., Inc. v. United States, 472 F.3d 1347, 1356 n.17 (Fed. Cir. 2006); Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003); Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 2003); see also McCarthy, 503 U.S. at 144 ("[W]here Congress has not clearly required exhaustion, sound judicial discretion governs."). After reviewing the record relating to the exhaustion issue in this case, we conclude that the trial court did not abuse its discretion in applying the exhaustion requirement and declining to apply the "futility" exception. We therefore uphold the trial court's refusal to consider the merits of Corus's challenge to the duty absorption issue.[5]

---

[5] Our holding that the trial court did not abuse its discretion by requiring the exhaustion of administrative remedies does not imply that the court would have abused its discretion if it had excused Corus from having to exhaust its administrative remedies. For that reason, our decision in this case does not necessarily affect the disposition of the appeal in Agro Dutch Industries, Ltd. v. United States, No. 2007-1011, which is pending before this court. In that case, the trial court, relying on the "pure legal issue"

AFFIRMED.

---

exception to the exhaustion requirement, held that the plaintiff was not required to exhaust its administrative remedies in order to raise a similar challenge to Commerce's interpretation of 19 U.S.C. § 1675(a)(4).