Slip Op. 10-12

UNITED STATES COURT OF INTERNATIONAL TRADE

ANDAMAN SEAFOOD CO., LTD., *et al.*,

                    Plaintiffs,

     – v –

UNITED STATES,

                    Defendant.

Before: Pogue, Judge

Court No. 09-00091

OPINION

[Plaintiffs' motion for judgment on agency record denied; Commerce's final Section 129 determination affirmed]

Dated: February 2, 2010

White & Case LLP (Walter J. Spak, Frank H. Morgan and Jay C. Campbell) for the Plaintiffs.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (L. Misha Preheim), and, of counsel, Jonathan Zielinski, Office of Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

**Pogue, Judge:** This action raises the question of whether the government may choose to give only prospective effect to its decision to bring its administration of domestic antidumping law into compliance with international commitments.

Plaintiffs are producers/exporters of frozen warmwater shrimp from Thailand. Plaintiffs seek review of the Department of Commerce's ("Commerce" or "the Department") response to the

findings of a World Trade Organization ("WTO") panel regarding the antidumping duty investigation of certain frozen warmwater shrimp from Thailand.[1]  Specifically, Plaintiffs challenge Commerce's partial, rather than total, revocation of the antidumping order at issue, and the Department's decision to apply only prospectively the revised antidumping margin contained in the Final § 129 Determination, *i.e.*, the decision to apply the recalculation of the Department's determinations of sales at less than fair value ("LTFV"), the revised antidumping margin, solely to subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of that Final § 129 Determination.  Plaintiffs contend that in declining to apply the revocation of the antidumping order to unliquidated entries predating the effective date of implementation of the Final § 129 Determination, the Department acted contrary to law. (Compl. ¶ 16.)[2]

---

[1] See Implementation of the Findings of the WTO Panel in United States – Antidumping Measure on Shrimp from Thailand, 74 Fed. Reg. 5,638 (Dep't Commerce Jan. 30, 2009) (notice of determination under Section 129 of the Uruguay Round Agreements Act ("URAA"), 19 U.S.C. § 3538 ("Section 129"), and partial revocation of the antidumping duty order on frozen warmwater shrimp from Thailand) ("Final § 129 Determination").

[2] In their complaint, Plaintiffs also claim that Commerce improperly failed to exclude from the antidumping duty order two additional companies, which were non-existent or inoperational at the time of the original investigation but were subsequently found by the Department to be collapsible into the Rubicon Group. (Compl. ¶¶ 17-18.)  On October 13, 2009, Commerce excluded these

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(c).[3]  Because domestic law permits the agency's determination, the court concludes that the Department did not act contrary to law.

## BACKGROUND

This action stems from Commerce's 2005 antidumping duty order covering certain frozen warmwater shrimp from Thailand that were entered or withdrawn from warehouse for consumption on or after August 4, 2004 (the "subject merchandise"). See Certain Frozen Warmwater Shrimp from Thailand, 70 Fed. Reg. 5,145 (Dep't Commerce Feb. 1, 2005) (notice of amended final determination of sales at less than fair value and antidumping duty order) ("Final

---

two companies from the order, following a changed circumstances review. Certain Frozen Warmwater Shrimp from Thailand, 74 Fed. Reg. 52,452 (Dep't Commerce Oct. 13, 2009) (final results of antidumping duty changed circumstances review and notice of revocation in part).  Accordingly, this issue is now moot, and Plaintiffs are no longer pursuing their claim in this regard. (See Def.'s Mem. in Opp'n to [Pls.'] Rule 56.2 Mot. for J. Upon Agency R. 2 n.1; Pls.' Reply Br. ("Pls.' Reply") 1 n.1).

[3] 28 U.S.C. § 1581(c) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930."); Section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1516a(a)(2) (A)(i)(III) & (B)(vii) ("Within thirty days after [] the date of publication in the Federal Register of . . . notice of the implementation of [a determination under Section 129 of the URAA] . . ., an interested party . . . may commence an action in the United States Court of International Trade by filing a summons, and within thirty days thereafter a complaint . . ., contesting any factual findings or legal conclusions upon which the determination is based.").

Determination & Order"); see also Sections 731-36 of the Tariff
Act of 1930, as amended, 19 U.S.C. §§ 1673-73e(a) (2006).[4]  The
subject merchandise included goods that Plaintiffs produced or
exported.

In its Final Determination & Order, Commerce calculated
Plaintiffs' dumping margins by using a "zeroing" methodology.[5]
The Department's use of this methodology was challenged at the
WTO, and, in response to this challenge, a WTO dispute settlement
panel concluded that the United States – by employing zeroing to
calculate dumping margins in the Final Determination & Order –
acted inconsistently with Article 2.4.2 of the Agreement on
Implementation of Article VI of the General Agreement on Tariffs
and Trade 1994 ("WTO Antidumping Agreement").  The WTO panel
recommended that the United States bring its dumping
determination into conformity with its obligations under the
relevant WTO agreements. Panel Report, United States – Measures
Relating to Shrimp from Thailand, ¶¶ 2.2, 8.2, 8.6, WT/DS343/R
(Feb. 29, 2008) ("U.S. – Shrimp (Thailand) Panel Report"). (See

---

[4] Further citation to the Tariff Act of 1930, as amended, is
to Title 19 of the U.S. Code, 2006 edition.

[5] "Zeroing" is a methodology "whereby only positive dumping
margins (i.e., margins for sales of merchandise sold at dumped
prices) were aggregated, and negative margins (i.e., margins for
sales of merchandise sold at nondumped prices) were given a value
of zero." Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343,
1345-46 (Fed. Cir. 2005).  The effect of "zeroing" may be to
increase the amount of the antidumping duty ordered.

also Compl. ¶ 7.)

The United States did not appeal the panel's conclusion in this respect,[6] and the panel's report was adopted by the WTO Dispute Settlement Body ("DSB") on August 1, 2008. Action by Dispute Settlement Body, United States – Measures Relating to Shrimp from Thailand, WT/DS343/14 (Aug. 7, 2008). (See also Compl. ¶ 7.)[7]

Following the DSB decision, the government entered into the statutory process to determine whether and how to respond. See 19 U.S.C. § 3538.  Specifically, on November 14, 2008, Commerce "advised interested parties that it was initiating a proceeding under section 129 of the URAA . . . that would implement the findings of the WTO dispute settlement panel in [U.S. – Shrimp (Thailand) Panel Report]." Final § 129 Determination, 74 Fed. Reg. at 5,638. See also 19 U.S.C. § 3538(b).[8]  The

---

[6] See Appellate Body Report, United States – Measures Relating to Shrimp from Thailand, ¶ 181, WT/DS343/AB/R (July 16, 2008) (listing issues raised on appeal).

[7] Pursuant to Article 21.3(b) of the Understanding on Rules and Procedures Governing the Settlement of Disputes ("DSU"), the disputing parties agreed that the reasonable period of time for the United States to implement the recommendations and rulings of the DSB in this dispute would expire on April 1, 2009. Agreement under Article 21.3(b) of the DSU, United States – Measures Relating to Shrimp from Thailand, WT/DS343/16 (Nov. 4, 2008).

[8] "Congress has established two procedures by which a negative WTO decision may be implemented into domestic law.  The first method, a Section 123 proceeding, is the mechanism to amend, rescind, or modify an agency regulation or practice in

Department then issued its preliminary results, on November 21, 2008, and, after receiving comments and rebuttal comments from the interested parties, the Department issued its final results on January 12, 2009.  In its final results, the Department recalculated the weighted-average dumping margins from the antidumping investigation without zeroing, i.e.,  by applying the calculation methodology described in <u>Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation</u>, 71 Fed. Reg. 77,722 (Dep't Commerce Dec. 27, 2006) (final modification). <u>Final § 129 Determination</u>, 74 Fed. Reg. at 5,638-39.

Continuing the statutory process, "the [United States Trade Representative ("USTR")] held consultations with the Department and the appropriate congressional committees with respect to this determination [as required by section 129(b)(3) of the URAA]," <u>id.</u> at 5,638, and, on January 16, 2009, "in accordance with sections 129(b)(4) and 129(c)(1)(B) of the URAA, the USTR

---

order to implement a decision by the WTO that such is inconsistent with U.S. treaty obligations. [. . .]  The second method, a Section 129 proceeding, is [more] discrete[, *i.e.,*] Section 129 sets forth a procedure to implement a negative WTO decision with respect to a specific agency determination that the WTO found [insufficient to] support an unfair trade order." <u>Corus Staal BV v. United States</u>, __ CIT __, __, 593 F. Supp. 2d 1373, 1377-78 n.11 (2008) (internal emphasis, alteration, quotation marks and citations omitted). <u>See also</u> <u>U.S. Steel Corp. v. United States</u>, __ CIT __, __, 637 F. Supp. 2d 1199, 1205-06 (2009); <u>Acciaierie Valbruna S.p.A. v. United States</u>, No. 08-00381, 2009 WL 2190188, at *2 n.5 (CIT July 23, 2009).

directed the Department to implement in whole this determination." Id. See also 19 U.S.C. § 3538(b)(4).

Accordingly, on January 30, 2009, Commerce issued notice of its determination under Section 129, stating that the Department will apply the recalculated weighted-average dumping margins from the antidumping investigation of frozen warmwater shrimp from Thailand to subject merchandise entered or withdrawn from warehouse for consumption on or after January 16, 2009, the effective date of the determination. Final § 129 Determination at 5,639; see 19 U.S.C. § 3538(c)(1)(B) (determination under Section 129 shall apply to entries made on or after "the date on which the Trade Representative directs [Commerce] to implement that determination").

The re-calculated margins for Plaintiffs were *de minimis*, Final § 129 Determination, 74 Fed. Reg. at 5,639; see 19 U.S.C. § 1673b(b)(3) (defining *de minimis* as less than two percent). Based on this finding, the Department partially revoked the antidumping order with respect to Plaintiffs, effective for all entries of the subject merchandise entered on or after January 16, 2009, the effective date of the recalculation. Final § 129 Determination, 74 Fed. Reg. at 5,639; Partial Revocation of Antidumping Duty Order on Certain Frozen Warmwater Shrimp from Thailand Produced and Exported by the Rubicon Group Co's, A-549-822 (CBP Feb. 23, 2009), Admin. R. Pub. Doc. 44; see also 19

U.S.C. 1673d(a)(4) (Commerce shall disregard *de minimis* dumping margins).

Plaintiffs now challenge the Final § 129 Determination, arguing that, first, the United States retains no legal authority to assess antidumping duties on Plaintiffs' prior unliquidated entries (*i.e.*, unliquidated entries made prior to January 16, 2009 – the effective date of the Section 129 recalculation and partial revocation of the dumping order) because "the effect of the Section 129 Determination was to invalidate the original LTFV determination with respect to the [Plaintiffs]" (Mem. of P. & A. in Supp. of Pls.' USCIT R. 56.2 Mot. for J. on Agency R. ("Pls.' Mem.") 8), and "[t]he U.S. antidumping law mandates that antidumping duties can only be assessed when there is a valid determination of dumping" (id. at 11 (citing 19 U.S.C. § 1673)).

Plaintiffs rely on Laclede Steel Co. v. United States, 20 CIT 712, 928 F. Supp. 1182 (1996); Jilin Henghe Pharm. Co. v. United States, 28 CIT 969, 342 F. Supp. 2d 1301 (2004), vacated as moot, 123 F. App'x 402 (Fed. Cir. 2005); and Tembec, Inc. v. United States, 30 CIT 1519, 461 F. Supp. 2d 1355 (2006), judgment vacated, 31 CIT 241, 475 F. Supp. 2d 1393 (2007) (hereinafter collectively referred to as the "Laclede line" of cases), for the proposition that "[o]nce Commerce's final antidumping determination has been invalidated, it cannot serve as a legal basis for the imposition of antidumping duties." (Id. at 12

(quoting <u>Jilin</u>, 28 CIT at 978, 342 F. Supp. 2d at 1309-10); <u>see</u> <u>generally</u> <u>id.</u> at 11-14.)

Second, Plaintiffs argue that Commerce's decision not to apply the Section 129 recalculation and partial revocation of the dumping order to those of Plaintiffs' unliquidated entries that were entered prior to the Section 129 determination is not consistent with the United States's international obligations under the WTO agreements, and therefore contrary to law, pursuant to <u>Murray v. Schooner Charming Betsy</u>, 6 U.S. (2 Cranch.) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ."). (Compl. ¶ 16.)

Plaintiffs rely on two other WTO Appellate Body Reports, <u>United States – Measures Relating to Zeroing and Sunset Reviews,</u> <u>Recourse to Article 21.5 of the DSU by Japan</u>, WT/DS322/AB/RW (Aug. 18, 2009), and <u>United States – Laws, Regulations and</u> <u>Methodology for Calculating Dumping Margins ("Zeroing"), Recourse</u> <u>to Article 21.5 of the DSU by the European Communities</u>, WT/DS294/AB/RW (May 14, 2009) (Pls.' Mem. 16-18) for the proposition that "the WTO Agreements establish that prospective compliance means applying a measure that is WTO-consistent after the compliance period ends – irrespective of when the entries occurred." (<u>Id.</u> at 17-18.)  Invoking <u>Allegheny Ludlum Corp. v.</u> <u>United States</u>, 29 CIT 157, 173, 358 F. Supp. 2d 1334, 1348 (2005)

("[Where] Congress has not statutorily created an unavoidable conflict with the WTO, there exists no reason not to look to the WTO for assistance in interpreting U.S. law" (citations omitted)) (relying on Charming Betsy, 6 U.S. (2 Crach) at 118; Fed. Mogul Corp. v. United States, 63 F.3d 1572, 1582 (Fed. Cir. 1995)), Plaintiffs argue that, consistent with the cited Appellate Body reports, Section 129 should be interpreted to apply to all entries of subject merchandise which remain unliquidated at the time that the Final § 129 Determination is implemented. (See Pls.' Mem. 16-19.)

As explained below, the court rejects both of Plaintiffs' arguments.

## STANDARD OF REVIEW

In an action brought, as here, under Section 516A of the Tariff Act of 1930, the court shall "hold unlawful any [agency] determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). See also, e.g., PAM S.p.A. v. United States, 582 F.3d 1336, 1339 (Fed. Cir. 2009). In considering legal issues, if a statutory provision directly addresses the question at issue, its plain meaning controls. Nippon Steel Corp. v. United States, 337 F.3d 1373, 1380 (Fed. Cir. 2003) ("'If the intent of Congress is clear, that is the end of the matter; for the court, as well as

the agency, must give effect to the unambiguously expressed intent of Congress.'" (quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984))); Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) ("Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter.").

**DISCUSSION**

1.   The Section 129 Determination Did Not Invalidate the Antidumping Order.

The Laclede line of cases stand for the established principle that an invalid antidumping determination cannot serve as a legal basis for the imposition of antidumping duties.  Thus, under the Laclede line, once an agency determination is ruled to have been invalid, all affected unliquidated entries must be liquidated in accordance with that ruling, regardless of their date of entry.

Nevertheless, Plaintiffs cannot successfully invoke the Laclede line's principle here, because the underlying antidumping order in this case has not been invalidated.  Rather, on its face, the Final § 129 Determination is a "partial" and prospective revocation of the underlying order.  As a matter of law, the statutory provisions under which the Final § 129 Determination is issued explicitly provides for such a

determination.  By the statute's plain terms, a determination

implemented pursuant to Section 129 "shall apply with respect to

unliquidated entries of the subject merchandise . . . that are

entered, or withdrawn from warehouse, for consumption on or after

. . . the date on which the Trade Representative directs

[Commerce] . . . to implement that determination." 19 U.S.C.

§ 3538(c)(1).  The statute does not specify that a Section 129

determination must be implemented retroactively.  Accordingly,

regardless of whether the agency may reasonably interpret the

statute to apply to *all* unliquidated entries of subject

merchandise (a question the court need not and does not decide

here), it is clear that, at the very least, the law explicitly

contemplates the application of determinations made under its

auspices solely to entries made on or after January 16, 2009, the

date on which the USTR directed its implementation – that is, the

law explicitly permits the route adopted by Commerce in this

case.

Moreover, the statute's plain language is buttressed by the

Statement of Administrative Action:

> Consistent with the principle that GATT panel
> recommendations apply only prospectively, subsection
> 129(c)(1) provides that where determinations by . . .
> Commerce are implemented under subsection[] . . . (b),
> such determinations have *prospective effect only*.  That
> is, they apply to unliquidated entries of merchandise
> entered, or withdrawn from warehouse, for consumption
> on or after the date on which the Trade Representative
> directs implementation.  Thus, *relief available under*

> *subsection 129(c)(1) is distinguishable from relief available in an action brought before a court or a NAFTA binational panel, where, depending on the circumstances of the case, retroactive relief may be available.* Under 129(c)(1), if implementation of a WTO report should result in the revocation of an antidumping [] duty order, entries made prior to the date of [the] Trade Representative's direction would remain subject to potential duty liability.

Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 1026 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4313 ("URAA SAA") (emphasis added).

It is clear, therefore, that Commerce's determination under Section 129 – in response to a DSB decision that the agency's action is not consistent with the WTO Antidumping Agreement – has a very different effect than a decision of a U.S. Court or a North American Free Trade Agreement ("NAFTA") Panel[9] that such an action was from the beginning inconsistent with U.S. antidumping law. The plain language of the statute provides that Commerce is

---

[9] See NAFTA Art. 1904.2 ("An involved Party may request that a panel review, based on the administrative record, a final antidumping [] determination of a competent investigating authority of an importing Party to determine whether such determination was in accordance with the antidumping [] law *of the importing Party.* For this purpose, the antidumping [] law consists of the relevant statutes, legislative history, regulations, administrative practice and judicial precedents to the extent that a court of the importing Party would rely on such materials in reviewing a final determination of the competent investigating authority. Solely for purposes of the panel review provided for in this Article, the antidumping [] statutes of the Parties, as those statutes may be amended from time to time, are incorporated into and made a part of this Agreement." (emphasis added)).

to apply a determination under Section 129 prospectively, *i.e.*, to entries made on or after the date on which the USTR directs its implementation. There is nothing on the face of the law to suggest that its effect is to invalidate the original determination in so far as that original determination applies to entries not explicitly covered by the terms of Section 129. To the contrary, the Department's use of zeroing in arriving at an affirmative LTFV determination – the basis of the challenge and consequent adverse decision in the WTO – has been consistently upheld by U.S. courts as a matter of U.S. law.[10]

---

[10] See <u>Timken Co. v. United States</u>, 354 F.3d 1334, 1343 (Fed. Cir. 2004) ("According Commerce its proper deference, we hold that it reasonably interpreted [19 U.S.C.] § 1677(35)(A) to allow for zeroing."); <u>see also</u> <u>id.</u> at 1344 (refusing "to overturn the zeroing practice" based on a WTO Appellate Body decision); <u>Corus Staal BV v. United States</u>, 502 F.3d 1370, 1372 (Fed. Cir. 2007) ("[The Federal Circuit] has held that although the antidumping statutes do not require the use of zeroing in calculating dumping margins, Commerce's zeroing methodology is a permissible interpretation of the statutory provisions." (citations omitted)); <u>U.S. Steel</u>, __ CIT at __, 637 F. Supp. 2d at 1210 ("[T]he Federal Circuit has repeatedly found that the pertinent antidumping statutes do not unambiguously reveal Congress's position on the issue of zeroing . . . ." (citations omitted)); <u>id.</u> at 1212 ("In recognition of Commerce's expertise in the field of antidumping law, the court owes substantial deference to the agency when it interprets an ambiguous antidumping statute." (citation omitted)). In <u>Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation</u>, 71 Fed. Reg. 77,722 (Dep't Commerce Dec. 27, 2006) (final modification), Commerce announced that it will no longer employ the zeroing methodology in investigations using average-to-average comparisons. <u>See</u> <u>Corus Staal</u>, 502 F.3d at 1373 n.1 (defining average-to-average valuation). However, "[i]t is clear that Commerce intends to apply its new policy on zeroing only prospectively." <u>Id.</u> at 1374.

Unlike the case at bar, in each of the <u>Laclede</u> line of cases, the relevant agency determination was held, by either a U.S. Court or a NAFTA Panel,[11] not to have been validly propagated *as a matter of U.S. law*.[12]  That is, in each of these cases, the court held that, because the agency determination had been made contrary to the U.S. antidumping statute, that determination was never validly made, and that therefore no

---

[11] <u>See</u> *supra* note 9.

[12] With respect to <u>Laclede</u>, <u>see</u> <u>Laclede</u>, 20 CIT at 716, 928 F. Supp. at 1187 (holding that Commerce must apply the rate affirmed by the court after remand to unliquidated entries made prior to the court's decision invalidating Commerce's initial assessment); <u>Laclede Steel Co. v. United States</u>, 18 CIT 965 (1994) (invalidating Commerce's initial determination as a matter of U.S. law).  With respect to <u>Jilin</u>, <u>see</u> <u>Jilin</u>, 28 CIT at 969-70, 342 F. Supp. 2d at 1303 ("Commerce's liquidation instructions seek to impose antidumping duties on Plaintiffs' entries pursuant to an antidumping order which was invalidated, with regard to Plaintiffs, by the Court's decision in <u>Rhodia, Inc. v. United States</u>, 26 CIT 1107, 240 F. Supp. 2d 1247 (2002)."); <u>Rhodia</u>, 26 CIT at 1108, 240 F. Supp. 2d at 1249 (noting that the court initially remanded the case back to Commerce because its determination was not supported by substantial evidence, in violation of U.S. law).  With respect to <u>Tembec</u>, <u>see</u> <u>Tembec</u>, 30 CIT at 1524-32, 461 F. Supp. 2d at 1360-67 (holding that the revocation of an antidumping order as a result of its invalidation by a NAFTA panel applies to unliquidated entries made prior to <u>Timken</u> notice because it was "the intent of Congress that there be the same results with respect to refunds [of cash deposits] whether an appeal is taken to a NAFTA panel or this Court"); <u>Tembec, Inc. v. United States</u>, 30 CIT 958, 441 F. Supp. 2d 1302 (2006) (holding the antidumping order invalid as a matter of U.S. law because injury determination was invalidated by NAFTA panel); <u>id.</u> at 961, 1308 ("The NAFTA Panel issued its decision . . ., finding that the [International Trade Commission]'s injury determination was not supported by substantial evidence or in accordance with U.S. law.").

outstanding entries may be liquidated on the basis of such agency action.

Here, on the other hand, the successful challenge to Commerce's initial antidumping order was made at the level of the WTO DSB, which concluded, on the basis of the WTO Antidumping Agreement, that regardless of its validity as a matter of U.S. antidumping law, this determination had been made contrary to international agreement. See U.S. - Shrimp (Thailand) Panel Report at ¶¶ 2.2, 8.2, 8.6. The question before the court, therefore, is whether the effect of a determination made pursuant to Section 129 - the statute used to implement the response of the United States, as a matter of domestic law, to the DSB's recommendations in U.S. - Shrimp (Thailand) Panel Report - is the same as a holding by a U.S. court that the initial challenged determination was issued in a manner that was contrary to law. The court concludes that it is not.

A Section 129 proceeding responds, *inter alia*, to a WTO DSB decision that a particular agency determination is not consistent with the United States' obligations as a Member of the WTO Antidumping Agreement. See 19 U.S.C. § 3538(b). As this Court explained in Tembec[13]:

---

[13] Although the judgment in Tembec was vacated due to settlement, the decision itself was not withdrawn. Tembec, 31 CIT at 251, 475 F. Supp. 2d at 1402.

> Unlike litigation before the court or a NAFTA panel, WTO Members are not required automatically to comply with the recommendations of a WTO panel or the [Appellate Body]. While compliance is encouraged, the DSU contemplates three different responses to an adverse WTO panel report. A Member may elect to bring its domestic practices in line with the WTO's recommendations. Alternatively, Members may substitute a compensatory trade agreement that lowers other barriers to trade while leaving an objectionable practice in place. Finally, a Member may choose not to comply with the WTO's recommendation.

Tembec, 30 CIT at 984-85, 441 F. Supp. 2d at 1328 (citing URAA SAA at 1008-09[14]). Accordingly, "Congress fashioned section 129 to allow the United States to take full advantage of its remedial options before the WTO." Id. (footnote omitted).

In this case, Commerce, the USTR, and the pertinent Congressional committees deemed a prospective partial revocation and recalculation of dumping margins under Section 129 to be the appropriate response to the WTO panel decision in U.S. – Shrimp (Thailand). See Final § 129 Determination. Consequently, in this

---

[14] URAA SAA at 1008-09 ("It is important to note that the [] WTO dispute settlement system does not give panels any power to order the United States or other countries to change their laws. If a panel finds that a country has not lived up to its commitments, all a panel may do is recommend that the country begin observing its obligations. It is then up to the disputing countries to decide how they will settle their differences. The defending country may choose to make a change in its law. Or it may decide instead to offer trade 'compensation' – such as lower tariffs. The countries concerned could agree on compensation or on some other mutually satisfactory solution. Alternatively, the defending country may decide to do nothing. In that case, the country that lodged the complaint may retaliate by suspending trade concessions equivalent to the trade benefits it has lost.").

case, the Department's recalculations pursuant to Section 129,

which resulted in *de minimis* rates for Plaintiffs, are

permissibly applicable solely to entries made on or after the

date on which the USTR directed implementation of the Section 129

determination. 19 U.S.C. § 3538(c)(1)(B).[15]  The resulting

partial revocation of the antidumping order with respect to

Plaintiffs, see Final § 129 Determination, is therefore similarly

applicable to the same set of entries – those made on or after

the effective date of implementation of the Section 129

determination.

Because the recalculation on which the partial revocation is

based applies to entries made on or after its date of

implementation, "[c]onsistent with the principle that GATT panel

recommendations apply only prospectively," URAA SAA at 1026, and

because the Department's initial calculations, leading to a

determination of sales at LTFV using a zeroing methodology, have

not been invalidated as a matter of U.S. law,[16] the LTFV

determination and any antidumping duties assessed on its basis

remain in effect with respect to entries not covered by the

---

[15] See also Acciaierie Valbruna, 2009 WL 2190188, at *1 n.1
("The plain language of Section 129 of the URAA provides that a
determination made under that provision has prospective effect,
thereby applying only to entries made on or after the date the
[USTR] directs [Commerce] to implement the decision." (citing
19 U.S.C. § 3538(c)(1)(B))).

[16] See *supra* note 10.

Section 129 recalculation – that is, with respect to all entries of subject merchandise made prior to the date of implementation of that determination. Accord Corus Staal, __ CIT at __, 593 F. Supp. 2d at 1386 (noting that Commerce's use of zeroing to calculate dumping margins is not unlawful as a matter of U.S. law, and concluding accordingly that "Commerce did not err when it instructed Customs to impose antidumping duties on Corus's entries of [the subject merchandise] given the valid determination of dumping and assumption of injury at the time these entries were made"). See also Corus Staal, 502 F.3d at 1373-75 (upholding Commerce's decision not to alter an administrative review determination "as a result of the post-POR prospective revocation of the order" pursuant to a Section 129 recalculation (quotation marks and citation omitted)); 19 U.S.C. § 1675(d)(3) (determination to revoke order shall apply to unliquidated entries entered "on or after the dates determined by the administering authority"); Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States, 30 CIT 1537, 1542 n.8, 464 F. Supp. 2d 1350, 1355-56 n.8 (2006) ("Commerce's exclusive authority includes establishing the effective date of revocation." (citations omitted)).

        Plaintiffs therefore improperly rely on Laclede, Jilin, and Tembec. Because the Department's original LTFV determination with respect to certain frozen warmwater shrimp from Thailand has

not been held to have been invalidly made as a matter of U.S. law, its use as a basis for the assessment of duties on entries made prior to the effective date of the order's revocation is not contrary to the statute. See 19 U.S.C. §§ 1673e; 3538(c)(1).

2. Application of the *Charming Betsy* Principle Does Not Alter the Effect of Section 129.

Plaintiffs also argue that Section 129 should be interpreted so as to be consistent with WTO Appellate Body decisions, pursuant to the principle expressed by the Supreme Court in Charming Betsy, 6 U.S. (2 Cranch.) at 118 ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ."); see also Norsk Hydro Canada, Inc. v. United States, 472 F.3d 1347, 1360 n.21 (Fed. Cir. 2006) ("The rule of interpretation announced in [Charming Betsy] instructs that domestic law should be interpreted consistently with American international obligations to the degree possible."). Plaintiffs claim that WTO decisions require that, once the reasonable implementation period agreed upon by parties to a WTO dispute has expired (in this case, on April 1, 2009), any remaining unliquidated entries of subject merchandise must, in accordance with the DSU, be liquidated in a manner not inconsistent with the recommendations of the DSB.[17]

---

[17] (Pls.' Mem. 16-19 (relying on Appellate Body Report, United States – Measures Relating to Zeroing and Sunset Reviews, Recourse to Article 21.5 of the DSU by Japan, WT/DS322/AB/RW

As already noted however, the clear intent of Congress in adopting Section 129 of the URAA was "to allow the United States to take full advantage of its remedial options before the WTO." Tembec, 30 CIT at 985, 441 F. Supp. 2d at 1328 (citing URAA SAA at 1008-09; 19 U.S.C. § 3538[]).  The URAA was accordingly expressly designed so as to preserve the independence of U.S. law from adverse decisions of the DSB until such time as the political branches decide that, of the options available to the United States under the WTO Agreements, a change in U.S. law and/or policy or methodology is most appropriate. See id.

In this case, applying the Plaintiffs' interpretation of WTO precedent to compel Commerce to retroactively apply its partial revocation of the antidumping order to entries made prior to the effective date of that partial revocation would run counter to the clear and unambiguous meaning of current U.S. law.  As explained above, the antidumping order in question was never invalidated as a matter of U.S. law.  Accordingly, it remains in effect for all entries of subject merchandise entered on or after the effective date of the order until the effective date of its partial revocation. See 19 U.S.C. §§ 1673e; 1675(d)(3).  To the extent that Plaintiffs are correct that the application of this

_____

(Aug. 18, 2009); and Appellate Body Report, United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing"), Recourse to Article 21.5 of the DSU by the European Communities, WT/DS294/AB/RW (May 14, 2009)).)

statutory scheme to some subset of their unliquidated entries conflicts with U.S. obligations under the WTO Agreements (another question that the court need not, and does not decide here), that matter is for the WTO to decide, and, if appropriate, for further proceedings by the executive agencies in accordance with the statutory scheme.

**CONCLUSION**

For all of the foregoing reasons, Plaintiffs' Motion for Judgment on the Agency Record is DENIED.  Judgment will be entered for Defendant.

It is SO ORDERED.

                                          /s/ Donald C. Pogue
                                        Donald C. Pogue, Judge

Dated:     February 2, 2010
           New York, N.Y.