**Slip Op. 10-36**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PASTA ZARA SpA**, | |
| Plaintiff, | |
| v. | |
| **UNITED STATES**, | **Before: Timothy C. Stanceu, Judge** |
| Defendant, | **Court No. 09-00001** |
| and | |
| **AMERICAN ITALIAN PASTA COMPANY, DAKOTA GROWERS PASTA COMPANY, and NEW WORLD PASTA COMPANY**, | |
| Defendant-Intervenors. | |

## OPINION AND ORDER

[Affirming in part and remanding in part the final results of the eleventh administrative review of an antidumping duty order on certain pasta from Italy]

Dated: April 7, 2010

Law Offices of David L. Simon (*David L. Simon*) for plaintiff.

*Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Carrie A. Dunsmore* and *Jane C. Dempsey*); *Daniel J. Calhoun* and *Mykhaylo Gryzlov*, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*Kelley Drye & Warren LLP* (*David C. Smith, Jr.* and *Paul C. Rosenthal*) for defendant-intervenors.

Stanceu, Judge: Plaintiff Pasta Zara SpA ("Zara SpA" or "Zara"), an Italian producer and exporter of pasta products, contests the final determination ("Final Results") that the International Trade Administration, United States Department of Commerce ("Commerce" or the "Department"), issued to conclude the eleventh administrative review of an antidumping duty order on certain pasta from Italy (the "subject merchandise"). *Certain Pasta From Italy: Notice of Final Results of the Eleventh Admin. Review & Partial Rescission of Review*, 73 Fed. Reg. 75,400, 75,400 (Dec. 11, 2008) ("*Final Results*"). Zara SpA advances three claims. It claims, first, that Commerce erred in deeming Zara SpA's sales of subject merchandise to be constructed export price ("CEP") sales rather than export price ("EP") sales. Compl. ¶¶ 10-13. Second, plaintiff contests Commerce's classifying certain accounting expenses incurred by Zara's U.S. affiliate as direct expenses rather than indirect expenses. *Id.* ¶¶ 14-18. Finally, Zara challenges Commerce's finding that Zara's sales in its home market of Italy occurred at a single level of trade ("LOT"), when, according to Zara, the record evidence establishes that some of these sales occurred at a second, more remote level of trade. *Id.* ¶¶ 19-23. Zara claims that Commerce erred in failing to exclude these sales from the calculation of normal value. *Id.* Based on an examination of the record evidence supporting Commerce's findings, the court affirms Commerce's decision to classify Zara's U.S. sales as CEP sales. Because the Final Results do not address the objection underlying plaintiff's second claim and because defendant agrees that a remand is appropriate on this claim, the court's order directs Commerce to reconsider its decision to treat the accounting expenses as indirect expenses. On plaintiff's third claim, the court, concluding that Commerce did not give adequate consideration to the relevant

record evidence, orders Commerce to reconsider its determination that Zara's home market sales occurred at a single level of trade.

## I. BACKGROUND

Commerce initiated the eleventh review of an antidumping duty order on certain pasta from Italy on August 24, 2007. *Initiation of Antidumping & Countervailing Duty Admin. Reviews & Request for Revocation in Part*, 72 Fed. Reg. 48,613, 48,614 (Aug. 24, 2007). Commerce published preliminary results of the eleventh review on August 6, 2008, in which it determined for Zara SpA a preliminary weighted-average dumping margin of 10.34%. *Certain Pasta from Italy: Notice of Prelim. Results of Eleventh Antidumping Duty Admin. Review*, 73 Fed. Reg. 45,716, 45,720 (Aug. 6, 2008) ("*Prelim. Results*"). In the Final Results, Commerce assigned Zara a margin of 9.71%. *Final Results*, 73 Fed. Reg. at 75,401. The Final Results incorporate by reference a memorandum ("Decision Memorandum") containing a discussion of the Department's findings and conclusions. *Id.*; *Issues & Decisions for the Final Results of the Eleventh Admin. Review of the Antidumping Duty Order on Certain Pasta from Italy (2006-2007)* (Dec. 4, 2008) ("*Decision Mem.*").

Plaintiff brought this action on January 5, 2009. Summons; Compl. Before the court is plaintiff's motion for judgment upon the agency record. Mot. of Pl. Pasta Zara SpA for J. upon the Agency R. pursuant to Rule 56.2 ("Pl. Mot."); Principal Br. of Pl. Pasta Zara SpA for J. upon the Agency R. pursuant to Rule 56.2 ("Pl. Br."). Defendant opposes Zara's motion with respect to the first and third claims in the complaint but acknowledges that a court remand is appropriate on the second claim, agreeing "that Commerce did not adequately consider Zara's contention" that certain "accounting expenses should be treated as indirect selling expenses, because they

were not related to specific sales but were incurred regardless of the number of sales made in any given time period." Def.'s Resp. to Pl.'s Mot. for J. upon the Agency R. 18 ("Def. Resp."). Defendant-intervenors oppose Zara's motion with respect to all three of plaintiff's claims. Def.-Intervenors' Br. in Resp. to Pasta Zara's Mot. for J. on the Agency R. ("Def.-Intervenors Resp.").

## II. DISCUSSION

The court exercises jurisdiction according to 28 U.S.C. § 1581(c) (2006). In ruling on Zara's motion for judgment upon the agency record, the court must hold unlawful any determination, finding, or conclusion found to be unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i) (2006). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

### A. The Court Must Sustain Commerce's Determination that Zara's Sales of Subject Merchandise Were Constructed Export Price Sales

Zara SpA contests as unsupported by substantial record evidence Commerce's determination that its sales of subject merchandise were constructed export price sales as defined by 19 U.S.C. § 1677a(b) rather than export price sales as defined by § 1677a(a). Compl. ¶¶ 10-13; 19 U.S.C. § 1677a(a)-(b) (2006). Based on the administrative record, the court must sustain Commerce's determination.

According to the statutory definition, export price is

the price at which the subject merchandise is first sold (or agreed to be sold) *before the date of importation* by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States.

19 U.S.C. § 1677a(a) (emphasis added). A constructed export price sale, in contrast, may occur either before or after the date of importation. *Id.* § 1677a(b). A constructed export price sale is a sale that is made in the United States by or for the account of the producer or exporter, or by a seller affiliated with the producer or exporter, to a purchaser unaffiliated with the producer or exporter. *Id.*

It is undisputed that a U.S. affiliate of Zara, Pasta Zara-USA Inc. ("Zara-USA"), Compl. ¶ 15, performed a role related to the sale of the subject merchandise in the United States that included invoicing the U.S. unaffiliated customer for the merchandise. Pl. Br. 6-8. The parties dispute the significance of that role and of the invoices. *See id.* 8-18; Def. Resp. 8-12; Def.-Intervenors Resp. 4-21. Partly as a result of that dispute, they disagree on the issue of whether the sales of Zara's subject merchandise qualified as export price sales.

Plaintiff argues that the course of dealing between Zara SpA, Zara-USA, and the single unaffiliated U.S. purchaser demonstrates that arm's-length sales, or agreements to sell, between Zara SpA and the unaffiliated purchaser occurred outside of the United States prior to the date of importation. Pl. Br. 6-9. In plaintiff's view, "the mutual assent to the price and quantity terms clearly occurs between Zara SpA and the arm's-length customer long before the goods are shipped from Italy." *Id.* at 9. Plaintiff contends that a binding agreement to sell the subject merchandise is formed "when the customer issues its purchase order and Zara [SpA] relies on the purchase order to begin production." *Id.* at 3. Although admitting that Zara SpA did not provide the unaffiliated customer a written acknowledgment of its acceptance of the purchase order, plaintiff argues that "[t]he mutual assent is evident in Zara's production against the customer's purchase order, which specifies both price and quantity" and that "Italy is therefore the 'location

of the sale' and Zara SpA is therefore the seller; no subsequent actions can change these facts." *Id.* at 9. Plaintiff cites the United Nations Convention on Contracts for the International Sale of Goods, arts. 14, 18, *opened for signature* Apr. 11, 1980, S. Treaty Doc. 98-9, at 25 (1983), 19 I.L.M. 671, 674-75 ("CISG" or the "UN Convention"), for the proposition that this production against the purchase orders created binding agreements to sell. *Id.* at 9, 17. It relies on *Corus Staal BV v. United States*, 502 F.3d 1370, 1376 (Fed. Cir. 2007), and *AK Steel v. United States*, 226 F.3d 1361, 1374 (Fed. Cir. 2000), to support its argument that these sales, as agreed upon in Italy, are EP sales according to the statute. *Id.* at 8-9, 17. Plaintiff also cites several antidumping determinations from administrative reviews of other subject merchandise, *id.* at 9-12, to support its contention that, an agreement to sell already having been established, no meaningful activities occurred in the United States.

In reviewing the Department's factual determinations according to the substantial evidence standard, the court examines the evidence on the record considered as a whole. *See* 19 U.S.C. § 1516a(b)(1)(B)(i); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (holding that the court may affirm a determination as supported by substantial record evidence even if some evidence detracts from the Department's conclusion). The record as a whole contains some evidence to support plaintiff's "course of dealing" argument. For example, Zara SpA provided in its questionnaire response documentation for an example of one of its sales, including an invoice that plaintiff describes as "the export invoice, showing the customer as Zara-USA and the destination as the unaffiliated customer." *Pasta Zara SpA Questionnaire Resp.* 14 (Dec. 12, 2007) (Confidential Appendix of Pl. Pasta Zara SpA to Principal Br. of Pl. Pasta Zara SpA for J. upon the Agency R., Ex. 3) ("*Questionnaire Resp.*"). The questionnaire

response refers to a second invoice as "the invoice of Zara-USA to the unrelated customer." *Id.*

In its response to Commerce's supplemental questionnaire, Zara explained that "[t]he role of

Zara-USA is minimal, . . . [a]ll customer relations are handled directly by Zara in Italy," and "US

sales do not physically pass through the possession of Zara-USA." *Letter from Law Offices of*

*David L. Simon to Sec'y of Commerce* 45 (Apr. 8, 2008) (Admin. R. Doc. No. 77) (at page 39 of

the response) ("*Supplemental Resp. Letter*").

The difficulty with plaintiff's argument is the substantial record evidence supporting

Commerce's findings. Commerce concluded, on the basis of those findings, that the sales of the

subject merchandise to the unaffiliated purchaser were made not by Zara SpA but instead were

made by Zara-USA, after importation. *Decision Mem.* 15-16. Commerce found that invoices

issued to the unaffiliated U.S. purchaser were Zara-USA's invoices and that "Zara stated in its

questionnaire response that Zara sells to Zara USA, and Zara USA sells to an unaffiliated U.S.

customer, who pays Zara USA." *Id.* at 16. Zara SpA's response to Commerce's supplemental

questionnaire stated as follows:

> Zara-USA is the US importer of record, and so it receives an invoice from the
> customs broker, which it then pays. In addition, Zara-USA issues the invoices for
> the US sales to the arm's-length customers. . . . Zara-USA also receives the
> payment from US arm's-length customers, which it then deposits in its bank
> account in the United States.

*Supplemental Resp. Letter* 45 (at page 39 of the response). Based on record evidence, Commerce

found as facts that "Zara USA serves as importer of record and it transfers title to the first

unaffiliated purchaser in the United States." *Decision Mem.* 16. Referring to Zara-USA's

activities and a company that performs them, Zara SpA stated in the supplemental questionnaire

response that "[t]he accounting/consultant company that performs these services is paid from the

revenue of Zara-USA." *Supplemental Resp. Letter* 46 (at page 40 of the response). In response

to a question from Commerce about why payment is made to Zara-USA and how payment is

forwarded to Italy, Zara stated that

> In terms of the document flow, Zara SpA sells to Zara-USA, and Zara-USA sells to American customer. The American customer than [*sic*] pays Zara-USA. This payments [*sic*] is in the bank account of Zara-USA, and it is not sent back to Italy.
>
> Money goes from Zara-USA to Zara SpA when Zara-USA pays for the pasta invoiced to it from Zara SpA.

*Supplemental Resp. Letter* 48 (at page 42 of the response). In the Decision Memorandum,

Commerce cites this questionnaire response as record evidence to support its finding that "by

Zara's own admission, Zara USA makes the first sale to an unaffiliated customer in the United

States." *Decision Mem.* 16. Commerce also found that "[t]he invoice issued to the first

unaffiliated customer identifies Zara USA as the seller of subject merchandise, and the terms of

sale are not finalized prior to the issuance of the invoice." *Id.* (citing *Mem. from Case Analysts,*

*Office III, to The File* 6 (Oct. 10, 2008) (Admin. R. Doc. No. 131) ("*Verification Report*") ("We

asked how the difference in the amounts billed from Zara to Zara USA and from Zara USA to the

unaffiliated U.S. customer is reflected in Zara USA's general ledger and Mr. Atkin said that it is

entered in Zara USA's gross profit.")).

Upon considering the record as a whole, the court finds substantial record evidence to

support the essential findings of fact upon which Commerce concluded that the sales of the

subject merchandise to the unaffiliated U.S. purchaser were made by Zara-USA in the United

States, after the merchandise was imported. Accordingly, the court must affirm Commerce's

determination that the sales of the subject merchandise were constructed export price sales

according to the requirements of the statute. *See* 19 U.S.C. § 1677a(a)-(b).

Plaintiff argues that the placement of the purchase orders and Zara SpA's "acceptance-in-

fact," Pl. Br. 9, by beginning production in response to the purchase orders created a binding

agreement under the UN Convention, *i.e.*, the CISG, to which the United States is a party. *Id.*

at 9, 17 (citing CISG, arts. 14, 18, S. Treaty Doc. 98-9, at 25, 19 I.L.M. at 674-75). The CISG

recognizes that

> if, by virtue of the offer or as a result of practices which the parties have
> established between themselves or of usage, the offeree may indicate assent by
> performing an act, such as one relating to the dispatch of the goods or payment of
> the price, without notice to the offeror, the acceptance is effective at the moment
> the act is performed, provided the act is performed within the period of time laid
> down in the preceding paragraph.

CISG, art. 18.3, S. Treaty Doc. 98-9, at 25, 19 I.L.M. at 675. The preceding paragraph states that

"[a]n acceptance is not effective if the indication of assent does not reach the offeror within the

time he has fixed or, if no time is fixed, within a reasonable time . . . ." *Id.*, art. 18.2, S. Treaty

Doc. 98-9, at 25, 19 I.L.M. at 675. The court does not agree that the CISG required Commerce

to conclude, on the record before it, that binding agreements to sell the subject merchandise

necessarily were formed when Zara SpA began production of merchandise in response to the

purchase orders. Commerce was not required to view the course of dealing between Zara SpA,

Zara-USA, and the single unaffiliated U.S. purchaser, on which plaintiff relies for its claim, in

isolation and without also considering the evidence revealing the entire circumstances in which

the three parties, in practice, arranged the transactions. Those circumstances include the

practices involving invoicing. Zara SpA admits that it did not provide the unaffiliated customer a

written acknowledgment of its acceptance of the purchase, *see* Pl. Br. 7-9, and it does not identify specific record evidence from which Commerce was required to conclude, contrary to other evidence on the record, that the parties unequivocally intended production against the purchase orders to constitute acceptance of the offers made by those purchase orders. In summary, plaintiff's argument would require the court to ignore the significance of the substantial record evidence supporting Commerce's factual findings. Those findings were more than adequate to support the conclusion that the sales of the subject merchandise were made by Zara-USA, after importation. The CISG did not require Commerce to ignore this substantial evidence or make findings contrary to it.

The holdings in *AK Steel*, 226 F.3d 1361, and *Corus Staal*, 502 F.3d 1370, lend no support to plaintiff's argument that the sales in question must be recognized as EP sales. Neither of these cases establishes a rule requiring Commerce, on the particular record before it, to find that an agreement, or agreements, to sell the subject merchandise to the unaffiliated U.S. customer came into existence outside of the United States and prior to importation.

B.  Commerce Volunteers to Reconsider Its Classification of Zara-USA's Accounting Expenses as Direct, Rather than Indirect, Sales Expenses for Purposes of Calculating CEP

Defendant agrees with plaintiff that a remand is appropriate to allow Commerce to reconsider its decision to classify Zara-USA's accounting expenses as direct, rather than indirect, sales expenses for purposes of determining CEP. Def. Resp. 18; Pl. Br. 18-19. Defendant-intervenors contend that Commerce acted lawfully in treating the accounting expenses as direct sales expenses and that Commerce gave adequate consideration to this issue during the review,

having discussed Zara's arguments in a preliminary analysis memorandum.  Def.-Intervenors

Resp. 30-34.

The court finds no discussion in the Final Results or the Decision Memorandum

demonstrating that Commerce's final determination gave adequate consideration to Zara SpA's

position on the accounting expenses in question.  *Final Results*, 73 Fed. Reg. at 75,402; *Decision

Mem.* 12 (addressing, at Comment 6, only petitioner's contention that Commerce made a

programming error and understated Zara's U.S. direct selling expenses).  The preliminary

memorandum cited by defendant-intervenors, although included in the record, is not incorporated

by reference into the final determination that is before the court for review.  *See Final Results*,

73 Fed. Reg. 75,400; *Mem. from Case Analyst, AD/CVD Operations, Office 3, to The File*

(July 30, 2008) (Admin. R. Doc. No. 110).  Consequently, the decision to classify the accounting

expenses as direct selling expenses is presented to the court absent any reasoning.  Because the

United States acknowledges that Commerce did not fully consider the question, which is

discussed in neither the Final Results nor the incorporated Decision Memorandum, the court

orders Commerce, on remand, to reconsider its determination to classify the accounting expenses

as direct expenses and make changes as necessary.

C.  Commerce Must Reconsider Its Determination that Zara SpA's Home Market Sales Occurred
at a Single Level of Trade

Plaintiff claims that Commerce erred in considering Zara SpA's sales in the home market

to have been made at a single level of trade ("LOT").  Pl. Br. 19.  Commerce, Zara SpA argues,

should have determined normal value according to the sales Zara SpA made in Italy to a group of

larger customers it describes as including "wholesalers, large distribution organizations,

discounters, and hypermarkets." *Id.* (quoting *Supplemental Resp. Letter* 9-20 & Ex. 7 (at pages 3-14 & Ex. 7 of the response)). Zara SpA further describes these home market customers as "multi-location customers with their own warehouses, distribution capabilities, and strong informatics to handle electronic transactions." *Id.* Zara SpA distinguishes these customers from a second group described as "traditional local" customers, consisting of "dettaglio (small mom-and-pop convenience stores of under 150 square meters), hotels and restaurants, communities (*e.g.*, monasteries) and associations (*e.g.*, sports clubs)." *Id.* (emphasis omitted). Buyers in this second group, according to Zara SpA's questionnaire responses, typically buy pasta in smaller quantities than full pallet-loads and truckloads, and they purchase from inventory rather than contracting for pasta produced to order. *Id.* at 20. "These customers are all within a very small radius of distance from the Zara factory," *id.* at 19, and "have single locations, very limited storage capacity, no distribution capability, and very limited informatics." *Id.* at 20. Plaintiff argues that Commerce's combining, in a single LOT, the sales to these two groups of home market customers was not supported by substantial record evidence. *Id.*

Commerce by regulation has provided that "[t]he Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent)." 19 C.F.R. § 351.412(c)(2) (2009). Qualifying this general principle, the regulation adds that "[s]ubstantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." *Id.* The regulation does not define what is meant by the "equivalent" of "different marketing stages," but the preamble Commerce published when promulgating the regulation ("Preamble") sheds light on the intended meaning. The Preamble explains that "Section 351.412(c)(2) states that an LOT is a

marketing stage 'or the equivalent' (which means that merchandise does not necessarily have to

change hands twice in order to reach the more remote LOT)." *Antidumping Duties;*

*Countervailing Duties*, 62 Fed. Reg. 27,296, 27,371 (May 19, 1997) ("*Preamble*").  Based on the

clarification in the Preamble, the sales to the second group of customers plaintiff identifies would

appear not to constitute a different marketing stage *per se* because these customers purchased

directly from the producer, with no intermediate distributor.  The question, then, is whether

Commerce lawfully determined that these sales were not made at the "equivalent" of a "different

marketing stage" within the meaning of 19 C.F.R. § 351.412(c)(2).

The Preamble to the Department's regulations speaks directly to the question of what

must be shown to establish a different level of trade based on the equivalent of a different

marketing stage:

> It is *sufficient* that, at the more remote level (i.e., more remote from the factory),
> the seller takes on a role comparable to that of a reseller if the merchandise had
> changed hands twice.  For example, a producer that normally sells to distributors
> (that, in turn, resell to industrial consumers) could make some sales directly,
> taking over the functions normally performed by the distributors.  Such sales
> would be at the same LOT as the sales through the distributors.  Each more
> remote level must be characterized by an additional layer of selling activities,
> amounting in the aggregate to a substantially different selling function.
> Substantial differences in the amount of selling expenses associated with two
> groups of sales *also* may indicate that the two groups are at different levels of
> trade.

*Id.* (emphasis added).  The Preamble adds that "[a]lthough the type of customer will be an

important indicator in identifying differences in levels of trade, the existence of different classes

of customers is not sufficient to establish a difference in the levels of trade."  *Id.*

Based on the construction of § 351.412(c)(2) set forth in the Preamble, to which

construction the court gives considerable deference, the court concludes that Zara SpA could

satisfy in either of two ways the requirement in § 351.412(c)(2) to demonstrate the equivalent of a different marketing stage. First, Zara SpA could show that in making sales to its traditional local customers it took over the function normally performed by a reseller, by demonstrating that it performed "an additional layer of selling activities, amounting in the aggregate to a substantially different selling function." *Id.* As the regulation states, "[s]ubstantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." 19 C.F.R. § 351.412(c)(2). According to the Preamble, the substantial differences in selling *activities* must amount in the aggregate to a substantially different selling *function* at the more remote level; hence, demonstrating adequately a different selling function, as opposed to demonstrating merely a difference in selling activities, would be "sufficient." *Preamble*, 62 Fed. Reg. at 27,371. As the Preamble also connotes through the use of the word "also," Zara SpA could demonstrate a more remote LOT through "[s]ubstantial differences in the amount of selling expenses associated with two groups of sales." *Id.* Demonstrating "[s]ubstantial differences in the amount of selling expenses" *may* be sufficient to establish a more remote LOT, the Preamble language suggests, but also might not be.

In summary, § 351.412(c)(2), as clarified by the Preamble, requires that the selling activities associated with the claimed LOT not only be "substantially different" but also be "characterized by an additional layer of selling activities, amounting in the aggregate to a substantially different selling function" in which the producer takes on the role of a reseller, such as a distributor. *Id.* A respondent's claim of a separate LOT may be aided by demonstrating "[s]ubstantial differences in the amount of selling expenses associated with two groups of sales,"

but according to the Preamble's clarifying language (in particular, the use of the word "also"), such a demonstration is not essential to a respondent's establishing a more remote LOT. *Id.*

Zara SpA argues that in selling to its traditional local customers it performed the separate functions of a distributor as well as those of a producer. Pl. Br. 25. Plaintiff points to questionnaire responses informing Commerce that Zara SpA performs selling activities associated with the traditional local customers that it does not perform for its other customers. *Id.* at 24-27. These selling activities include, *inter alia*, manual order taking through personal visits to the customer's location, receiving and processing payments by cash or check (including dealing with bounced checks) rather than electronic funds transfer, and paying truck drivers a handling fee for taking and remitting the payments. *Id.* at 27. Zara SpA explains that virtually all of the sales made to its "multi-location" customers, *id.* at 19, are delivered by common carrier, whereas this occurs for only a third of the shipments to its traditional local customers, "with 22% picked up directly from the factory by the customer, and 45% carried in the factory's own, small delivery vans. *Id.* at 27-28. Zara SpA maintains that, because the traditional local customers do not have the storage capacity to hold large amounts of inventory, Zara SpA must devote warehouse space at its older plant to breaking down pallets consisting of a single type of product and forming new pallets, using shrink wrap to form pallets with the specific product mix needed to fill small orders of traditional local customers, as would a distributor. *Id.* at 25-26. Zara SpA also points out that selling to the traditional local customers requires "a cadre of agents to take orders and receive payments from the traditional local customers." Reply Br. of Pl. Pasta Zara SpA for J. upon the Agency R. pursuant to Rule 56.2, at 10. It adds that smaller, single-location customers that are similar to its traditional local customers, but that are not near its original plant,

must buy from distributors rather than directly from Zara SpA because the company did not extend its program of marketing to these smaller customers when it opened its second plant, which is located 200 km from the original plant.  Pl. Br. 28.

As it had in the Preliminary Results, Commerce found in the Final Results that Zara SpA "does not have different marketing stages or their equivalent that would support a finding of different LOTs in the home market." *Decision Mem.* 20.  Specifically, Commerce found that the data in charts Zara SpA submitted (the "selling activity chart" and the "selling functions chart") did not show substantial differences in the two claimed LOTs.  *Id.* at 20-21.  "An analysis of the selling activities . . . shows that [Zara SpA] performs similar selling activities for different customer categories, although some of the activities were at different levels of intensity."  *Id.* at 20.  "Moreover, some selling activities within the claimed LOTH 1 [*i.e.*, activities performed in selling to the larger, multi-location customers] are at a higher level of intensity while other selling activities are at a lower level of intensity than the same selling activities in the claimed LOTH 2 [*i.e.*, activities performed in connection with the sales to the traditional local customers]."  *Id.*

The analysis applied in the Decision Memorandum to reject Zara SpA's claim of a more remote LOT is not the analysis that the Preamble discusses when explaining the meaning of § 351.412(c)(2).  Based on the selling activities and selling functions charts, the Decision Memorandum concludes that Zara SpA performed similar selling activities for the two claimed LOTs (although conceding that some of the activities were "at different levels of intensity").  *Id.* But an overlap in selling activities does not rule out a finding of different LOTs.  The Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") states that

"Commerce need not find that the two levels involve no common selling activities to determine

that there are two levels of trade." *The Uruguay Round Agreements Act, Statement of*

*Administrative Action*, H.R. Doc. No. 103-316 (Vol. 1), at 829 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4168 ("*SAA*").  Here, Zara SpA identified individual selling activities that

are not performed for the larger, multi-location customers, including selling activities performed

by a cadre of agents who visit personally, and service the accounts of, the traditional local

customers.  The Preamble draws a distinction between mere differences in selling activities and

differences in selling activities that establish a separate selling *function*, stating as follows:

> In other words, the statute indicates that two sales with substantial differences in
> selling activities nevertheless may be at the same level of trade, and the SAA adds
> that two sales with some common selling activities nevertheless may be at
> different levels of trade.  Taken together, the two points establish that an analysis
> of selling activities alone is insufficient to establish the LOT.  Rather, the
> Department must analyze selling functions to determine if levels of trade
> identified by a party are meaningful.  In situations where some differences in
> selling activities are associated with different sales, whether that difference
> amounts to a difference in the levels of trade will have to be evaluated in the
> context of the seller's whole scheme of marketing.

*Preamble*, 62 Fed. Reg. at 27,371.  The Decision Memorandum appears to base its rejection of

Zara SpA's claim of a separate LOT comprised of the home market sales to the traditional local

customers principally on a finding that Zara SpA "performs similar selling activities for different

customer categories." *Decision Mem.* 20.  Commerce relied on record evidence in the selling

activities and selling functions charts, concluding that such record evidence did not establish

differences in selling activities that Commerce found sufficient. *Id.*  Absent from the Decision

Memorandum is a discussion of why the separate selling *function* that Zara SpA claimed, based

on record evidence of selling activities required solely to perform the sales to the traditional local

customers, does not suffice to establish a "meaningful" LOT according to an analysis of the type Commerce contemplated when drafting the discussion of § 351.412(c)(2) in the Preamble. *See Preamble*, 62 Fed. Reg. at 27,371.

The Decision Memorandum also rejects Zara SpA's argument that it must break down and repackage pallets for individual small customers, stating that "the costs for breaking down pallets for shipment of individual cartons of merchandise should be accounted for in Zara's reported packing labor expenses." *Decision Mem.* 21. It rejects Zara's argument pertaining to a difference in advertising expenses because such expenses are direct expenses deducted from normal value that, according to Commerce, cannot establish different LOTs. *Id.* Similarly, it rejects Zara's argument based on differences in freight costs because freight costs are not a selling function and are deducted from the home market price. *Id.* The Decision Memorandum adds that "[t]he SAA states that the Department will ensure that expenses previously deducted from [normal value] are not deducted a second time through a LOT adjustment." *Id.*

The reasons Commerce gave in the Decision Memorandum for rejecting Zara SpA's arguments involving pallets, advertising, and freight costs do not suffice to support the determination that no separate LOT existed in the home market for the sales. The issue of the treatment of packing, advertising, and freight expenses is not the same issue as whether Zara SpA performed the selling function of a reseller, such as a wholesaler or distributor, with respect to the traditional local customers. Instead, Commerce needed to address the precise issue presented by Zara SpA's claim of separate LOTs and thereby decide whether it was appropriate to compare the U.S. sales, all of which were made to a single large customer, with a set of home market data that included the sales to the traditional local customers. Moreover, in mentioning the need to

ensure that expenses are not deducted twice through a LOT adjustment, Commerce confused the issue before it with a "double counting" issue posed by a LOT adjustment–an issue that is not presented in this case. Because Commerce failed in these respects to conduct the type of analysis required to resolve the LOT issue before it, the court must remand this issue to Commerce for reconsideration and redetermination as necessary.

Referring to the claimed differences in selling activities to the two groups of customers Zara SpA identified, defendant argues that "Commerce carefully analyzed these claimed differences and found that based on Zara's submitted information, Zara engaged in the same five selling activities, albeit at different intensities, for all of the customer categories in LOT-1 and LOT-2." Def. Resp. 16. This argument fails because the Decision Memorandum does not address specifically the selling activities required for servicing the traditional local customers and does not confront directly the issue of whether these activities constituted a substantially different selling function. *See Decision Mem.* 20-21. If these activities did constitute a substantially different selling function, an improper and inaccurate dumping margin could result from comparing the U.S. sales, all of which were made to a single large customer, with a group of home market sales that included the sales made to the traditional local customers. *See* 19 U.S.C. § 1677b(a)(1)(B)(i) (2006).

Defendant-intervenors oppose plaintiff's LOT argument on a different ground, arguing that Zara SpA is not entitled to any relief on its LOT claim because "it did not request, or demonstrate entitlement to, a LOT *adjustment* for its allegedly more remote LOT 2 sales in Italy." Def.-Intervenors Resp. 22. Defendant-Intervenors' argument relies on the SAA and appears to be based on a statutory construction under which Commerce lacks authority to

determine normal value according to a set of sales in the home market that do not include the sales made at a LOT more remote than the U.S. sales. *Id.* at 25 ("The SAA does not contemplate the wholesale *exclusion* of such sales from [normal value], but only that an *adjustment* to [normal value] 'may' be appropriate.").

Defendant-intervenors' statutory construction argument finds no support in the statutory language or the SAA. The statute, in 19 U.S.C. § 1677b(a)(1)(B)(i), provides that normal value is to be determined according to the price at which the foreign like product is sold or offered for sale in the home market in the usual commercial quantities and in the ordinary course of trade "and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i). The plain meaning of the statute is that Commerce is to base normal value on home market sales that are made in the usual commercial quantities and in the ordinary course of trade, and, to the extent practicable, is to base normal value on sales that are made at the same level of trade as the CEP sales. Where some home market sales occur at the same LOT as the U.S. sales, and some occur at a more remote LOT, Commerce, under defendant-intervenors' construction, is powerless to exclude the sales at the more remote LOT and instead may address the problem posed by the lack of comparability only through a LOT adjustment or CEP offset. This construction not only is at odds with plain meaning but, by forcing Commerce to make a LOT adjustment or CEP offset that otherwise might not be needed, could waste Commerce's resources and produce a less accurate result. The court concludes that the language and intended purpose of § 1677b(a)(1)(B)(i) do not support defendant-intervenors' restrictive interpretation of the Department's discretion under that provision.

Rather than provide support, the SAA refutes defendant-intervenors' construction of § 1677b(a)(1)(B)(i). The SAA explains that, as required by § 1677b(a)(1)(B), Commerce to the extent practicable is to establish normal value based on home market (or third country) sales at the same level of trade as the constructed export price or the starting price for export price. *SAA* at 829, *reprinted in* 1994 U.S.C.C.A.N. at 4167. "If Commerce is able to compare sales at the same level of trade, it will not make any level of trade adjustment or constructed export price offset in lieu of a level of trade adjustment." *Id.* As the SAA further explains, an adjustment to normal value for LOT may be appropriate "when sales in the U.S. and foreign markets cannot be compared at the same level of trade." *Id.* Read in its proper context, the SAA informs that the determination under § 1677b(a)(1)(B)(i) of which home market sales are at the level of trade of the constructed export price (or export price) sales and the determination of a level-of-trade adjustment or constructed export price offset are different determinations. *See* 19 U.S.C. § 1677b(a)(7) (providing for LOT adjustments or CEP offsets); *SAA* at 829-30, *reprinted in* 1994 U.S.C.C.A.N. at 4167-68. In summary, the statute and the SAA confirm that Commerce, to the extent practicable, is to establish normal value based on home market sales that are made at the same level of trade as the U.S. sales. Where that is not practicable, Commerce is authorized to perform a level-of-trade adjustment or constructed export price offset where appropriate under § 1677b(a)(7).

### III. CONCLUSION

For the reasons discussed in the foregoing, the court will remand the Final Results to Commerce for reconsideration of the Department's determination to treat Zara-USA's accounting expenses as direct, rather than indirect, sales expenses for purposes of calculating constructed

export price and its rejection of Zara SpA's position that normal value should have been based on

a level of trade defined to exclude the home market sales to the traditional local customers.  The

court will affirm Commerce's determination that Zara's sales are constructed export price sales.

## ORDER

Upon review of *Certain Pasta From Italy: Notice of Final Results of the Eleventh*

*Administrative Review & Partial Rescission of Review*, 73 Fed. Reg. 75,400 (Dec. 11, 2008) (the

"Final Results"), plaintiff's motion for judgment upon the agency record, the responses of

defendant and defendant-intervenors, and all papers and proceedings herein, and upon due

deliberation, it is hereby

**ORDERED** that the Final Results be, and hereby are, affirmed in part and remanded in part; it is further

**ORDERED** that Commerce shall reconsider its decision to treat the accounting expenses of Pasta Zara-USA Inc. as indirect sales expenses for purposes of calculating constructed export price in accordance with the principles stated in this Opinion and Order; it is further

**ORDERED** that Commerce's decision to base normal value on all home market sales, including the sales made by Pasta Zara SpA to the traditional local customers be, and hereby is, set aside as contrary to law; it is further

**ORDERED** that Commerce shall reconsider its decision to base normal value on all home market sales, including the sales made by Pasta Zara SpA to the traditional local customers, and shall conduct an analysis of whether Pasta Zara SpA performed a separate selling function in making the sales to the traditional local customers, in accordance with the principles stated in this Opinion and Order; it is further

**ORDERED** that the Final Results be, and hereby are, affirmed with respect to Commerce's determination that the sales by Pasta Zara SpA of subject merchandise are constructed export price sales; it is further

**ORDERED** that Commerce shall submit its redetermination upon remand within ninety (90) days of the date of this Opinion and Order; and it is further

     **ORDERED** that plaintiff and defendant-intervenors shall have thirty (30) days from the submission of Commerce's remand redetermination in which to file with the court comments on the remand redetermination.


                         /s/ Timothy C. Stanceu
                         Timothy C. Stanceu
                         Judge


Dated: April 7, 2010
      New York, New York